FREDERIC C. BARNS, Appellant, *v.* DAIRYMEN'S LEAGUE CO-OPERATIVE ASSOCIATION, INC., and Another, Respondents.

Fourth Department, May 4, 1927.

Agriculture — combination in restraint of trade — action by milk producer to restrain defendants from carrying out alleged combination to fix price of milk in city of New York and from carrying out arrangement whereby plaintiff's milk is refused by Dairymen's League Co-operative Association unless plaintiff shall become member thereof — Co-operative Association and other defendant, distributor of milk, entered into agreement whereby distributor agreed not to buy milk from any person not member of Co-operative Association signing pooling contract — Co-operative Association controls not more than fifty per cent of production within New York city area, and not more than fifty per cent of distributed milk within New York city — action not maintainable on theory of violation of Federal Anti-Trust laws — action not maintainable under General Business Law, § 340, on ground of unlawful combination — act of parties does not violate Penal Law, § 580 — co-operative association is exempted from operation of statutes — part of statutes, exempting Co-operative Association, is not unconstitutional — contract entered into between defendants is not contrary to principles of common law against monopolies — defendant distributor of milk, cannot be charged with entering into unlawful combination.

The plaintiff is a dairy farmer, who produces milk for sale. He brought this action to restrain the defendants from making or carrying out any combination to fix the price of milk in the State of New York, restraining the defendant

Dairymen's League Co-operative Association from doing any act whereby a monopoly in the production or sale of milk in the State is produced or whereby competition is prevented, and restraining both defendants from carrying out any arrangement whereby plaintiff's milk is refused by the defendant distributor doing business in New York city unless plaintiff would become a member of the defendant Co-operative Association by signing a so-called pooling contract. The defendant Co-operative Association controls not more than fifty per cent of production within the New York city area, and not more than fifty per cent of distributed milk within New York city. The so-called pooling agreement was devised for the purpose of equalizing the burden of a lesser price for surplus milk used in the production of butter, cheese and other products, and under its terms the amount received from the sale of fluid milk, which is always higher than the amount realized from milk used for producing cheese and butter, together with the amount received for milk sold for the production of butter, cheese and other products, was pooled and the members of the Co-operative Association were paid *pro rata* for their milk. A contract was made between the defendant Co-operative Association and the defendant distributor whereby the latter agreed to buy all its milk from the Co-operative Association and not to purchase any milk from any producer who had not signed the pooling agreement. Plaintiff refused to sign the agreement and the Co-operative Association refused to accept his milk. While an active campaign was conducted to induce farmers to sign the pooling agreement, there is no evidence that any one connected with the Co-operative Association or with the defendant distributor made any threats or attempted to intimidate the farmers to compel them to sign the pooling agreement.

This action cannot be maintained on the theory of a violation of the Federal Anti-Trust laws, for our courts of equity will not take cognizance of any claimed violation of either the Sherman Act or the Clayton Act.

Nor can the action be maintained on the theory that the contract between the two defendants constituted a violation of section 340 of the General Business Law, or section 580 of the Penal Law, in relation to monopolies, for the defendant Co-operative Association is expressly exempted from the operation of those statutes.

The exemption provisions in those statutes, exempting co-operative associations of farmers or dairymen from the operation of the statutes, are constitutional.

The plaintiff cannot succeed on the theory that the acts of the two defendants constituted a violation of the common-law doctrine which condemns as against public policy all combinations which tend to monopoly and to restrain competition. The effect of the contract between the two defendants is not to prevent the plaintiff from disposing of his milk, for it appears that the plaintiff had been disposing of his milk regularly, and apparently at a better price than the members of the Co-operative Association have received.

The defendant distributor entered into the contract when it became apparent to it that more than eighty per cent of its patrons producing grade A milk had signed the pooling agreement, and that, therefore, unless it made the contract with the Co-operative Association, it would have to seek other sources of supply. The mere fact that said distributor urged its patrons to join the pool does not constitute a violation of the law under the circumstances, and it was justified in entering into the contract in question.

APPEAL by the plaintiff, Frederic C. Barns, from a judgment of the Supreme Court in favor of the defendants, entered in the office

40

of the clerk of the county of Oneida on the 7th day of February, 1923, upon the report of a referee appointed to hear and determine the whole issues, and also from an order entered in said clerk's office on the 4th day of April, 1923, annulling and striking from the record plaintiff's requests to find, which were passed on by the referee and filed in said clerk's office on the 27th day of February, 1923, and so much of plaintiff's notice of exceptions as cover the refusals of the referee to find, as requested.

*W. R. Pratt,* for the appellant.

*Bradley Fuller* [*P. J. C. DeAngelis* and *Seward A. Miller* of counsel], for the respondent Dairymen's League Co-operative Association, Inc.

Judgment and order affirmed, with a separate bill of costs to each defendant upon the opinion of JAMES H. MERWIN, referee.

All concur.   Present — HUBBS, P. J., CLARK, SEARS, TAYLOR and SAWYER, JJ.

The following is the opinion of the referee:

JAMES H. MERWIN, Referee.   This action is brought by the plaintiff to obtain an injunction:

1. Restraining each of the defendants from making or carrying out any combination fixing the price of milk in the State of New York.

2. Enjoining the Dairymen's League Co-operative Association from doing any act whereby a monopoly in the production or sale of milk in the State is produced or whereby competition is prevented.

3. Restraining the defendants from carrying out any arrangement whereby plaintiff's milk is refused by the Borden's Farm Products Company unless plaintiff shall become a member of the Dairymen's League Co-operative Association, Inc.

There has been presented to the court a large mass of testimony with many voluminous documents tending to show the general situation in the dairy industry for a period of years, the circumstances surrounding the production and marketing of milk and the details of the various organizations of producers and buyers. The industry of counsel has compiled for the court an instructive array of authorities bearing upon the questions involved. The problem is one of great importance to the dairy industry and there are many and varied angles from which it may be viewed.

The plaintiff operates a farm in the town of Westmoreland, Oneida county, and has been operating it for a number of years and has been for some time a patron of the Borden's Farm Products Company which operates a receiving station at Westmoreland.

Owing to the formation of the Dairymen's League Co-operative Association, Inc., and the putting into effect of its exclusive contract with the Borden Company on April 1, 1922, causing that company to purchase milk of no one but pooling members, the plaintiff was obliged to seek another market, the plaintiff not wishing to sign one of the so-called pooling contracts which the Co-operative Association required.  He now claims that the arrangement or contract or combination entered into by the Co-operative Association, the Borden Company and others whereby he and many other dairymen similarly situated were prevented from selling in their accustomed markets, constituted an agreement or combination in restraint of trade and tended to monopoly and was illegal under the Anti-Trust laws of the State of New York and of the United States, and that he is entitled to have these arrangements or contracts defined by this court and declared void, and the defendants enjoined from continuing to carry them out.

In order intelligently to examine the facts, it is necessary that the general situation of the dairy industry be considered.  The whole difficulty seems to arise from the fact that milk is a perishable product and that owing to irregularities of production and consumption there is periodically a surplus which must be manufactured into a permanent product which brings a lower price for that purpose than when marketed as fluid milk for immediate consumption.  The milk producers situated within the New York zone, which, roughly speaking, is an area within 400 miles of New York city, have the benefit of the New York city fluid milk market. Milk sent to New York for fluid consumption has to be produced under certain hygienic conditions prescribed by the health department which to a certain extent increase the cost of production and the milk so produced and so delivered commands the highest price. The consumption of fluid milk in New York, however, does not vary to any great extent, whereas the normal production of the dairies has a large seasonal variation, the output being twice as great in the months of April, May, and June as it is in the corresponding months in the fall.  There is likewise a daily surplus which is naturally left over in the hands of the dealers who must carry a supply sufficient to meet their daily maximum needs for fluid milk. A third surplus is found in an actual excess of production in the New York milk zone over fluid milk demands even in the short months of the year.  All of this surplus must be manufactured into permanent products such as butter, cheese, evaporated milk, etc., but when it is so manufactured it comes into competition with country-wide and world-wide markets and commands a much lower price.  Milk products manufactured from milk produced in

the middle west, for example, carry a lower production cost because the milk is produced on cheaper land, with cheaper feed and under less restricted conditions than are required by the New York fluid milk market. The problem of the farmer, therefore, who is in the New York milk zone is the problem of disposing of his surplus to the best advantage.

It has been the custom for many years for the defendant Borden Company and the other large New York distributors to maintain their receiving stations throughout the New York milk zone and to attract thereto a sufficient number of producers to supply their fluid milk market at the minimum point of fall production. The distributors would take all their milk from the dairies throughout the year, and in the spring of the year they would have twice as much as they required for their fluid milk needs with the result that they themselves assumed the burden of manufacturing and marketing this surplus, also the surplus which would necessarily be in their hands from time to time from the daily casual variations both of consumption and production. The distributors were accustomed to purchase at a price low enough to protect them on the portion of the product which they had to sell in a cheaper market, hence the producers would receive a price some higher than what they could receive if they were selling entirely to manufacture, but not so high as if they were able to sell for entire fluid milk marketing. This was denoted a purchase for a " flat price." The large distributors of New York city milk were organized into an association called the Milk Conference Board controlling about seventy-five per cent of the New York city requirements and were accustomed to act together to a considerable degree in the determination of the price to be paid. There were so many individual producers that it was impossible for the distributors to be in actual contact with them and, therefore, the prices paid were to a very small degree the result of bargaining between the two groups. The distributors posted each month at their various receiving stations the price which they were willing to pay for the following month and the dairymen who delivered there had to accept that price or seek another market. And as another market usually meant a market for manufacture only, commanding a price even less than the posted price, it was natural that the posted price should be generally accepted, and would be as long as it were above the price for manufactured milk.

With this situation in the milk industry, a movement was started as early as 1907 looking toward the organization of milk producers for the purpose of marketing their milk collectively and putting them in a position where they could bargain with the New York

distributors and obtain better prices for their products, it being contended that the prices then prevailing were not sufficient to give the producers a fair return for their labor and for their capital invested. The Dairymen's League, Inc. (not the defendant in this action) was organized about 1907 and grew slowly at first, but finally accumulated sufficient volume to become a powerful factor in the market. It was a New Jersey stock corporation and the producers became members thereof by acquiring stock at the rate of twenty-five cents per cow. There were about 13,000 stockholders in 1916 in which year they began to sell their milk collectively. In 1921 there were over 99,000 stockholders. The corporation comprised members from New York, Pennsylvania, New Jersey, Connecticut, Massachusetts and Vermont.

The board of directors were elected at an annual meeting in the manner usually prescribed for stock corporations. There were unincorporated county organizations comprising all the stockholders in a county with a president and secretary which facilitated communication between the general officers and the scattered members. Each member signed a contract which in substance made the corporation his sales agent, consigning his milk to the corporation for purposes of sale and stipulating for a commission of one cent a hundred pounds for the service thus rendered. This contract was after the first six months terminable by either party upon thirty days' notice. Under these contracts and with this organization the Dairymen's League, Inc., proceeded to sell the milk of its members and the distributors instead of purchasing by the old one-sided method of posting a monthly price were compelled to bargain with the League officers for the milk from month to month.

The operations of the League were aided during the war for the reason that they were selling on a rising market. The war demand produced a great volume of export trade in all milk products and for a period of two or three years the problem of surplus milk practically disappeared because the demand for manufactured milk products was so great that milk was worth almost as much in the general market for manufacture as it was in the fluid milk market of New York. It was comparatively easy, therefore, for the League to sell all its milk at a flat price. With the end of the war export business suddenly ceased and instead of milk products exported consuming over 2,000,000,000 pounds per year, there were practically no exports at all. This brought about a precarious situation in the dairy industry for not only was it obliged to handle the ordinary seasonal surplus and daily surplus, but there was a great overproduction for the needs of the entire market. In anticipation of

this problem, the organizers of the Dairymen's League, Inc., had been working upon the general scheme of pooling the milk of all its members. Foreseeing the time when it would be impossible for them to sell all of the milk in the New York market and having to sell a considerable part of it for manufacture only, with the consequent impossibility of selling for all its members at one price, it conceived the idea of changing its organization so that it could sell the milk of all its members for a variety of uses and at a variety of prices as the market might demand and put all the proceeds into one fund which should be divided on an equal basis among its members. In other words, the plan distributed the burden of caring for the low priced surplus over all the members of the combination, and if the combination comprised all the producers in the New York milk zone, it would distribute that burden equally over the entire zone. It was considered necessary in order to bring this about that there should be special legislation permitting the organization of dairymen in a co-operative membership corporation and also exempting such a corporation and its members from the Anti-Trust laws of both State and Nation. This resulted in a variety of statutes, among others section 13-a of the Membership Corporations Law (as added by Laws of 1918, chap. 655),* under which the defendant Co-operative Association was organized in March, 1919. The formation of this organization was in pursuance of a wide campaign among the stockholders of the Dairymen's League and in pursuance of an authorization of a special meeting of that body held in March, 1919. Since the organization of the Co-operative Association the two corporations have existed side by side, having the same board of directors, the general idea being that the latter would ultimately absorb the former and be a sort of reorganization of it. That is to say, the co-operative form of organization under the new statutes was considered a better plan than the old stock corporation.

The new corporation proceeded actively to obtain the signed contracts of the producers who were members of the old corporation, these contracts providing for the much talked of pooling plan. In brief, each signer of it authorizes the Co-operative to sell his milk along with all the other signers for such purposes as it deems best and pool all the proceeds and pay a *pro rata* portion to the signer. The contract authorizes a deduction from the fund by the Co-operative for running expenses and capital investment and various other things, also provides penalties of considerable severity

---

* Repealed by Laws of 1926, chap. 231; now Co-operative Corporations Law, art. 4 (as added by Laws of 1926, chap. 231).

for non-performance on the part of the producer.   Some of the provisions of the contract are sharply criticised by the plaintiff's counsel, and they may be unwise, but they do not affect the general legality or illegality of the scheme.   The actual members of the Co-operative never numbered over thirty-four until April, 1922, it being the idea at first that all the contract signers should organize into local corporations and then into regional corporations, which in turn should become members of the parent association.   There were in fact organized from 900 to 1,000 locals, each one known as the Dairymen's League Co-operative Association of.............. (inserting the name of the locality).   These were organized from the home office and their affairs supervised by it and their expenses paid from the general fund.   Generally speaking the local signers of the pooling contracts were the members of the local corporations. In this connection, it may be said that the plaintiff contends the Co-operative is not selling the milk of its " members " so as to acquire the protection of certain exemptions in the statutes and the defendant for its purposes claims that the members and officers of the local association are not its spokesmen and do not bind it by their acts.   In my opinion, however, the members of these local associations, signers of the Co-operative contracts, are entitled to be considered as members of the Co-operative Association under the meaning of the statutes referred to.   I think the term " members " in this connection is intended to be broad enough to cover persons having the relation referred to and likewise I think that the said members of the locals and their officers are sufficiently connected with the parent association to bind it by their acts in regard to such matters as getting pooling contracts signed and spreading propaganda in favor of the plan emanating from the central office. Furthermore, on April 20, 1922, all signers of pooling contracts were constituted full members of the corporation in accordance with law by a resolution of the board of directors.

The Co-operative Association, having obtained approximately 50,000 subscribers to its pooling contracts, put its plan into operation on May 1, 1921.   Both the Co-operative Association with its new plan and the old Dairymen's League with its selling agency contracts, were thus operating side by side with the same board of directors.   Apparently not much more than half of the stockholders of the Dairymen's League signed the pooling contract at this time and the League was still under obligation to sell the milk of these former stockholders at the same time that the Co-operative Association was selling the milk of the poolers.   An effort was made to get a price for the old League members substantially similar to that received by the new Co-operative members, but this evidently

was very difficult and resulted in some injustice.   It appears that the old League members were sometimes receiving more for their milk and sometimes less than Co-operative members were receiving under their blended price.   The plan was tried for each dealer to pay his old League customers the same blended price he paid the Co-operative Association for his pooled customers, but this operated to give old League customers of a dealer who used most of his milk in the higher classification more money than pooling customers of the same dealer, while old League customers of a dealer who manufactured most of his milk received less than the pooled customers.   In order to remedy the confusion in the situation, the directors of the Dairymen's League and of the Co-operative Association thought they would cease acting as a selling agent for the old League stockholders and would only operate under the pooling contracts of the new Co-operative.   In other words, the old League would go out of business and be replaced by the new. This course of action was sanctioned by the annual meeting of the stockholders of the old League held in December, 1921, and the notice provided by the old agency contracts for terminating them was duly given to the effect that the League would not handle milk after April 1, 1922.   It is this action on the part of the directors, who were directors of both organizations, and the resultant widespread contention over the merits of the pooling plan, which have brought about this suit.

In March, 1922, the Co-operative submitted proposals to the dealers comprising the New York Conference Board, being the conditions upon which they would sell their milk beginning April first, the price being according to the use to which the milk was put.   Roughly speaking, class 1 receiving the highest price was whole milk, used in fluid form; class 2 was milk used for cream cheese, ice cream and similar products and commanded a lesser price; class 3 was milk used for condensed milk and milk powder, and class 4 milk used for butter and cheese.   The two last named classes commanding the lowest price comprised what is ordinarily termed "surplus."   The contracts made upon these proposals enabled the dealer to pay a fixed price in accordance with what he used his milk for and to that extent was a considerable advantage to him as it shifted the burden of caring for the surplus from his shoulders to that of the Co-operative Association and the scheme apparently was a welcome one to some distributors.   On the part of the Co-operative Association, there was a clause inserted which comes in for criticism on the part of the plaintiff which was intended to secure the benefit of the higher classification for Co-operative milk without regard to milk that might be purchased by the dealer

elsewhere.   The dealer had to agree that all his actual requirements in class 1 must be filled by pooled milk if it were sufficient and if more than sufficient, then all his class 2 requirements, and if there were still a surplus of pooled milk, then it should be used in class 3. For example, if the dealer purchased half his milk from the Co-operative and half from outside sources, the contract required him to pay the Co-operative on the highest classifications that its milk would supply.   The effect of this would be that the dealer would undoubtedly attempt to buy outside milk on the lowest possible basis and would not, if he could help it, pay fluid milk prices.   Having paid under his contract to the Co-operative for milk used in higher classifications, he would naturally not pay class 1 prices to outsiders for that which he used in lower classifications.   What the dealers could pay for independent milk would depend upon the general market.   If there were a surplus of milk available for New York requirements, which there generally is, the dealers would not pay independents more than class 4 prices.   In case there was a shortage, the dealers might have to buy independent milk at a price considerably higher than the class 1 Co-operative price.   Wherever the dealer gets his milk, he must pay the Co-operative on the highest classifications that its delivery will cover and he will not pay independents to supply the balance of his requirements for lower classifications any more than the market demands and if he has to pay more for it than he gets, in the lower classifications, I should imagine that he would decline to buy it.   At any rate, he would attempt to save himself at the expense of the independent market.

These contracts gave the Co-operative a monopoly of the highest priced classifications to the extent that it was able to fill the same by its deliveries and to the extent of the market controlled by its several contracting distributors.   This contract was entered into by a large number of the members of the New York Conference Board although a good many of them declined to accept it and bought from outside sources.   ·The defendant, the Borden Company, signed this contract in March, 1922, but a few days later substituted for it another contract eliminating the provisions giving the Co-operative the preferential market on the higher classifications, and substituting for these provisions an agreement to purchase their entire requirements from the Co-operative which in its turn agreed to supply the same.   The legal effect of the two contracts for the purposes of this case is not materially different.

The defendant, the Borden Company, was the largest distributor in New York and controlled about thirty per cent of the New York city fluid milk deliveries.   It appears, however, that the second and

third largest distributors, and at least six other of the larger distributors, declined to buy of the Co-operative and purchased in the outside market. As near as can be estimated by the evidence before me, the Co-operative Association in April, 1922, handled about forty per cent of the milk produced in the State of New York and about twenty-one per cent of the milk produced in the six States in which it operated. Just what proportion of milk used in New York city under the fluid milk classifications was controlled by the Co-operative does not appear, but it does not seem from the evidence that it could have been more than one-half. The Co-operative and Dairymen's League together handled for example, in May, 1921, 434,000,000 pounds, of which fifty-eight per cent was pooled. The total production for May, 1921, was 819,000,000 pounds in the New York milk shed. The number of pooling contracts held by the Co-operative in April, 1922, was about 57,000 as against about 46,000 in March and the business of the association amounted to more than $5,000,000 a month. The last statement in evidence is for March, 1922, in which month the Co-operative handled 353,000,000 pounds, of which seventy per cent was from pooled members. The figures for April, 1922, are not before me but the above are reasonably indicative of the general trend and I do not believe the relative proportions of pooled milk to total production have materially changed.

When the Co-operative started out to get its pooling contracts signed it quite naturally engaged in a wide-spread and intensive campaign to educate dairymen generally to what it believed to be the best solution of the problem of the dairy industry. A well-organized propaganda was set up, headed by the membership department of the Co-operative and spread out through the various local associations and county organizations. The Dairymen's League *News*, which had to be subscribed to by every stockholder of the old League, was constantly urging the adoption of the plan by all dairymen. There was, undoubtedly, some sharp controversy between persons and groups having opposite views on the subject. In the locality where the plaintiff lived there was considerable contention, several meetings were held and it appears that various persons at those meetings urged the farmers to sign the pooling contracts, among them being the plant manager and the district manager of the defendant Borden Company. There has not been brought before me any evidence of threats or intimidation or force having been used to drive anybody into signing these contracts. The expression appears in the League *News* that persons not signing " were going to be left without a market after April 1st," and the same and similar expressions were used by various

individuals, but I am inclined to interpret these expressions as the over-zealous opinions of partisans rather than definite threats backed by the power to carry them out. It can fairly be said that the members and officers of the Co-operative Association were putting forth their strongest efforts to obtain the successful adoption of the plan they believed to be to their advantage, and were doing this with the primary intention and purpose to better their economic status and not with a particular intention or purpose to injure the plaintiff or anybody else.

What is the law to be applied to the foregoing statement of facts?

In the first place, we may eliminate the Federal Anti-Trust laws. The courts of New York are now committed to the holding that our equity courts will not take cognizance, as a basis for relief, of any claimed violation of either the Sherman Act or the Clayton Act. (*Locker* v. *American Tobacco Co.*, 121 App. Div. 443; affd., 195 N. Y. 565; *Eastman Kodak Company* v. *Powers Film Products, Inc.*, 189 App. Div. 556, 560.)

The plaintiff's position is that the following New York State statutes apply to the acts of the defendants here and render them void:

Penal Law, § 580: " If two or more persons conspire:  *  *  * 5. To prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof; or,

" 6. To commit any act injurious to the public health, to public morals, or to trade or commerce, or for the perversion or obstruction of justice, or of the due administration of the laws,

" Each of them is guilty of a misdemeanor."

General Business Law, § 340 (as amd. by Laws of 1921, chap. 712): " Every contract, agreement, arrangement or combination whereby

" A monopoly in the manufacture, production or sale in this State of any article or product used in the conduct of trade, commerce or manufacture or of any article or commodity of common use is or may be created, established or maintained, or whereby

" Competition in this State in the supply or price of any such article, product or commodity is or may be restrained or prevented, or whereby

" For the purpose of creating, establishing or maintaining a monopoly within this State of the manufacture, production or sale of any such article, product or commodity, the free pursuit in this

State of any lawful business, trade or occupation is or may be restricted or prevented, is hereby declared to be against public policy, illegal and void."

The defendant Dairymen's League Co-operative Association contends, however, that its operations are specifically exempted from these statutes and that the contracts and combinations in this case cannot be declared illegal thereunder.

The plaintiff on his part claims that the exemptions in these statutes are unconstitutional.

Section 340 of the General Business Law contains the clause: " The provisions of this article shall not apply to cooperative associations, corporate or otherwise, of farmers, gardeners, or dairymen, including livestock farmers and fruit growers, nor to contracts, agreements or arrangements made by such associations."

In pursuance of this same policy, the Penal Law (§ 582, as amd. by Laws of 1918, chap. 491) contains the clause: " Associations, corporate or otherwise, of farmers, gardeners or dairymen, including livestock farmers and fruit growers, engaged in making collective sales or marketing for its members or shareholders of farm, orchard or dairy products produced by its members or shareholders are not conspiracies. Contracts, agreements, arrangements or combinations heretofore or hereafter made by such associations or the members, officers or directors thereof in making such collective sales and marketing and prescribing the terms and conditions thereof are not conspiracies and they shall not be construed to be injurious to trade or commerce."

The plaintiff bases his contention upon the case of *Standard Engraving Company* v. *Volz* (200 App. Div. 758), decided by the Appellate Division in the First Department, in which the court assumes the exemptions to be unconstitutional upon the authority of *Connolly* v. *Union Sewer Pipe Company* (184 U. S. 540).

The question actually decided by the Appellate Division was that even if the amendment adding the exception to the acts was void, nevertheless the balance of the act was in full force. The court does not discuss the problem of the constitutionality of the amendment at all.

In the case of *Buffalo Gravel Corporation* v. *Moore* (234 N. Y. 542) the same question was presented to the court but the decision expressly states that it is not considered.

It would seem that the constitutionality of these provisions was, therefore, a fairly open question in this State and I do not consider myself bound by the *Standard Engraving Company* case on that particular point. I believe that the authority of the *Connolly* case, which it follows, has been considerably modified by later

decisions of the United States Supreme Court and that it may be substantially disregarded.

The quarrel with these exempting clauses in statutes is based upon section 1 of the Fourteenth Amendment to the Federal Constitution declaring that no State shall " deny to any person within its jurisdiction the equal protection of the laws." The United States Supreme Court has many times declared that this does not prevent a State from making classifications which are reasonable and which are not mere arbitrary distinctions between persons or classes. This is a well-settled doctrine. In each case, therefore, the problem arises whether the given statute is such a reasonable classification or is a mere arbitrary and unreasonable discrimination. (*International Harvester Company* v. *Missouri,* 234 U. S. 199; *People* v. *Beakes Dairy Company,* 222 N. Y. 416.)

The United States Supreme Court in the *Connolly* case declared a statute invalid, where its provisions, " shall not apply to agricultural products or live stock while in the hands of producer or raiser." The same court in *Waters-Pierce Oil Company* v. *Texas* (177 U. S. 28) had declared valid an exemption providing " this act shall not be held to apply to live stock and agricultural products in the hands of the producer or raiser, nor shall it be understood or construed to prevent the organization of laborers for the purpose of maintaining any standard of wages," but it is not clear that the point was raised for decision in that case. In *International Harvester Company* v. *Missouri* (*supra*) the court held valid a State statute restraining combinations of manufacturers and dealers in commodities while permitting such combinations among " persons engaged in labor pursuits." The court says that the power of classification has a broad range and a statute is not invalid because of mere inequality. It " must be palpably arbitrary to authorize a judicial review of it, and that it cannot be disturbed by the courts ' unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched.' " It seems to me that the judicial construction of this kind of an exemption has undergone the same liberal development that has taken place in the construction of the Anti-Trust laws themselves, and I am very much disinclined to believe that the exemptions under review in this case would be declared void by the United States Supreme Court or by our own Court of Appeals. These exemptions to dairymen and agricultural producers generally and to organizations of workingmen have been made as a result of a long-considered and definitely established policy on the part of both this and other States and on the part of the Federal government itself. New York State investigated

the subject in great detail through the so-called Wicks legislative committee which recommended substantially the plan subsequently enacted into law.   The Legislature, supported by public opinion, has determined that the dairy industry and the farm industry in general is in a position where it needs a different treatment from ordinary business enterprises.   There are many reasons for this. The farmer is an individualist — he cannot combine his production in great, compact aggregations of capital; he cannot get the benefit of collective marketing except through a combination which is liable to be held invalid under the Anti-Trust statutes.   Just now the post-war readjustment of prices has hit him first and hardest.   The Legislature, backed by public opinion, has determined that the State can afford to give special treatment to this class of producers. It is a question not of technical constitutional law, but of social policy.   It is true that if under the cover of this beneficent policy, the farmers should develop an organization that absolutely controlled the price of dairy products and other farm products, and raised those prices to an unconscionable height, and indulged in the human greed which often accompanies monopoly, then it is not only probable but quite certain that the State would withdraw the protection of these exemptions and would require the farmers to come under the same laws as other business men.   But that is not the case at this time and for the present anyway it may be considered settled policy that the farmers and laboring men shall have the benefit of exemption from our anti-trust statutes.   This is no doubt partly due to the fact that these organizations are not money organizations and do not attain the tremendous cohesion and momentum which come from vast accumulations of material capital assets.   They are, accordingly, less adapted to the ruthless exploitation of their advantage over other people than are great capitalistic combinations.

In view of the above considerations, it seems to me that any court would be rash to assert that the exemptions in these statutes, representing as they do not only a State, but a national policy, are unreasonable, " palpably arbitrary," and discriminatory exemptions and are not within the domain of fair classification. At any rate, I do not consider it the province of this court so to hold and for the purposes of this case I decide that the exemptions in question are constitutional.

But the plaintiff asserts that apart from all statutory restraint there is a common-law doctrine which condemns as against public policy all combinations which tend to monopoly and to restrain competition to an extent that public suffering results or public conscience is shocked.   In other words, he invokes the common-law

rules against monopolies and restraints of trade.  It is true that the Anti-Trust statutes are substantially a modification of common law.  (*Matter of Davies*, 168 N. Y. 89, 101.)

He also asserts that the exemptions in the statutes are intended to apply merely to the fact of co-operative organization: that is to say, dairymen may combine together for collective marketing without thereby coming under the ban of the statute, but their protection goes no further, and if in so doing they create a situation which unreasonably tends to monopoly or unreasonably restrains competition or if they do acts which are unfair or oppressive to the public, then they are under the statute like any other person. This assertion, too, has some authority to justify it (*Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443) although the language of the New York exemption is very broad, particularly that of section 340 of the General Business Law.

Assuming that the two contentions above referred to are correct, I shall consider the cases decided both under the statute and under the common-law rule.  In fact it is often difficult to tell on which basis a given case has been decided.  It seems that about the only material effect of the statutes has been to make certain acts criminal which were not so before.

I think the labor union cases have more analogy to the situation here than any others which have been brought to my attention. There is a marked similarity in both practical and legal effect between a large group of men banded together into an association for the collective sale of their labor and a group of widely distributed farmers organized in a membership corporation for the sale of their milk.  One is about as helpless as the other in the absence of some organization and both are particularly liable to exploitation by the well-organized groups to which they must sell their product.  There appears to be much the same theory in a situation where the distributor or a group of distributors agree to buy League milk and League milk only and where an employer or a group of employers agree to hire only members of a given union.

Perhaps one of the most quoted cases, and much relied on by the plaintiff (*Curran* v. *Galen*, 152 N. Y. 33), was decided in 1897, and it held rather broadly that the agreement between the Ale Brewers' Association of Rochester and the brewery workers union requiring the discharge of any workmen not members of the latter was invalid because it tended to monopoly and exclusive privilege.  This was considerably limited, however, in *Jacobs* v. *Cohen* (183 N. Y. 207), decided in 1905, where the contract between the employers and unions by which only members of the latter were to be employed

was held valid. From this and later cases it may be stated to be the law that employers may agree with labor unions to employ only members of such unions in good standing provided they do not control the trade in any community to such an extent that it would be practically impossible for other persons to obtain employment. The test seems to be whether the parties have such a monopoly of the labor market that their contract absolutely deprives others of the probability of getting a job. The agreement is then said to be oppressive and contrary to public policy. (*National Protective Association* v. *Cumming*, 170 N. Y. 315; *McCord* v. *Thompson-Starrett Co.*, 129 App. Div. 130; affd., 198 N. Y. 587; *Grassi Contracting Company* v. *Bennett*, 174 App. Div. 244; *Brescia Construction Co.* v. *Stone Masons Contractors' Assn.*, 195 id. 647.)

The case of *Auburn Draying Company* v. *Wardell* (227 N. Y. 1) is a boycott case where the specific intent to ruin plaintiff's business was present. It should be paired with *Bossert* v. *Dhuy* (221 N. Y. 342) where the facts were not dissimilar but such intent was lacking.

An examination of the cases, other than labor cases, discloses language which often denounces in very sweeping terms the particular acts deemed before the court, but it is impossible for me to deduce a general rule of construction which is susceptible of definite statement. I am convinced that our courts, like the United States Supreme Court since the decisions in *Standard Oil Co. of N. J.* v. *United States* (221 U. S. 1) and *Locker* v. *American Tobacco Co.* (*supra*), will apply the " rule of reason " to every combination or agreement brought before them. Before it will condemn, there must appear the elements of injury to the public, or monopolistic control of a particular article of commerce, or unreasonable interference with and damage to the business of an individual, or the doing of illegal or unconscionable acts, or specific intent to do injury to some one else, or, in brief, at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men.

A few examples will serve to show the varied holdings, each case being almost its own precedent.

A combination of all the coal dealers of Lockport to fix prices eliminating competition is illegal (*People* v. *Sheldon*, 139 N. Y. 251; also *People* v. *Milk Exchange*, 145 id. 267), but an agreement between the manufacturers of patent medicines and a national wholesale druggists association to sell only to those who maintain uniform prices is valid. (*Park & Sons Co.* v. *National Druggists' Assn.*, 175 N. Y. 1.) A combination of ninety per cent of the book

publishers controlling the prices of books copyrighted and otherwise is illegal (*Straus* v. *American Publishers' Assn.*, 177 N. Y. 473), but the American Tobacco Company, a combination controlling ninety per cent of the trade in New York State, may sell or refuse to sell to whomever it chooses. (*Locker* v. *American Tobacco Co.*, 121 App. Div. 443; affd., 195 N. Y. 565.)

In *Sultan* v. *Star Company* (106 Misc. 43) a combination of newspapers refusing to sell to the plaintiff, a dealer, unless he sold the New York *American*, thereby forcing him to carry this newspaper or else go out of business, was held illegal.

Similar situations were considered in *Cummings* v. *Union Blue Stone Co.* (164 N. Y. 401) and *Cohen* v. *Berlin & Jones Envelope Co.* (166 id. 292), where combinations of ninety per cent of the producers of a certain kind of stone and eighty-five per cent of the manufacturers of envelopes were declared to be monopolistic and illegal.

What is the bearing of these principles of law upon the case before us? It is true that the Dairymen's League Co-operative Association has contracted with the Borden Company and other distributors in such a manner that all the milk but that produced by its members is excluded from the New York market so far as it is controlled by the purchasers from the League. This does not, however, pre-empt the entire market by any means. The association does not control more than fifty per cent of the milk produced in the New York milk zone nor do its distributors control more than fifty per cent of the fluid milk sold in New York city. There are other very important distributors who are buying non-pooled milk. The plaintiff himself seems to be selling to one of these at the present time. It cannot be said that the agreement under consideration is one which utterly deprives the plaintiff of his means of livelihood and shuts him out of the market. Furthermore, it seems to me that there is some confusion as to what market is limited by these agreements; certainly not the broad general market for manufactured milk which is really what determines the basic price of all milk and its product and which is so broad that it cannot be controlled by anybody. What is affected here is merely the specialized market for fluid milk in New York city. By reason of various factors, among which probably the existence of the defendant Co-operative Association is one of the chief, milk for fluid consumption in New York now commands a price very much above the general market. The plaintiff complains that he has been shut out of this market. It does not appear that he has been actually shut out, but even if he has, it is a question whether he

41

Fourth Department, May, 1927.          [Vol. 220

has any vested right to enjoy this preferential market.   His position is that he has the right to do so, but he is not willing to share in the burden which the Co-operative Association assumes in order to assist in keeping up this market.   Everybody cannot sell in the New York market and somebody must take the burden of the low-priced surplus.   If the plaintiff here were absolutely cut off from reasonable access to any market whatever, even the cheese factory, I think the law might properly intervene, but as it is it seems to me that such restriction as is caused by the Co-operative Association and its contractees is well within the limits permitted by law. The situation is not unlike the case where certain employers controlling, say one-half, of a given industry in a community, make an agreement with a labor union to employ only its members and to pay them a scale above the scale prevailing outside.   Surely no outside workman who did not wish to join the union could complain that he was illegally prevented from getting this higher wage when he was freely permitted to obtain employment from other employers at the prevailing rate.   So the plaintiff here complains, not because he is shut out from a market altogether, but because he is shut out from a highly preferential market.   In fact, it is inferable from the evidence that he is receiving more for his milk now than the Co-operative Association distributes to its members.

It seems clear to me that there is nothing in the agreements or arrangements between the defendants which makes them void and criminal under the statutes as construed or void under the common law.   There is nothing in the evidence indicating acts or practices on the part of the defendants which are unfair or vindictive or indicating intent to do ruthless damage to those outside of their circle.   I am convinced that the Co-operative Association, whatever may be its faults, has in good faith striven to build up an organization and a system of marketing which would be for the benefit of its own members and of the dairy industry in general. It is not an organization for profit.   It has not excluded anybody, but has solicited strenuously the membership of all dairymen, the plaintiff included, and has endeavored, to the best of its ability, to handle a very difficult situation attendant upon the marketing of its milk.   It does not appear in the evidence that any producer has been put out of business or deprived of a market although the plaintiff and doubtless many others have been compelled to change their market and possibly have been put to some inconvenience and some loss.   It may be that some of them have been deprived of the opportunity of selling in the New York market and have had to sell for manufacture at a less price, but as it has been before pointed

out this is a burden which must be carried by somebody because there is a large surplus over and above what can be consumed as fluid milk. It is not, therefore, such injustice as calls for legal intervention if the operations of a group trying to distribute the burden of this surplus equitably cause some individual to lose a highly preferential market. If there were no organized groups to care for the seller's interests then these individual producers would be part of a general competitive scramble for the best market and would undoubtedly depress that market to a point not far above the market for manufactured milk.

The defendants have done no black-listing or boycotting nor have they indulged in any of the underhand practices which so often have been under condemnation by the courts in cases like this and which always have a strong influence upon the decision of the court. The case is not unlike the *Steel Corporation* case (*United States* v. *U. S. Steel Corp.*, 251 U. S. 417) where the United States Steel Corporation was under attack under the Federal Anti-Trust laws. The corporation was shown to control about half the steel tonnage of the country and to be the preponderating influence in the matter of making prices but it was also shown that it had been guilty of no unfair practices, had not crushed its competitors, had not taken advantage of its size to obtain unreasonable prices, and although it undoubtedly in its formation tended to eliminate a certain amount of opposition and to a certain extent tended to monopoly, nevertheless it was not subject to condemnation under the statute as then construed.

I am forced to the conclusion that whether this case be tested as a common-law problem or as a statutory one, and whether or not the statutory exemptions to dairymen are valid, the agreements and circumstances proved do not show any unlawful combination, monopoly or restraint of trade on the part of the defendants.

A word should be said in regard to the defendant Borden's Farm Products Company. In so far as it is concerned in the matter at all it would be because it was part of a scheme entered into by the Co-operative Association and the Borden Company and other dealers to restrict the market and injure the plaintiff and others in such a manner as would be illegal. The conclusions heretofore arrived at probably discharge the Borden Company from any culpability because it has been found that there was no illegal combination of any kind, but as the Borden Company would not enjoy the benefit of the statutory exemptions from the operation of the Donnelly Act, my conclusions to the extent that they rested upon such exemptions would not apply. It seems plain, however, that the Borden Company cannot be called to account in this

action. It is the largest distributor of fluid milk in New York city and early in 1922 was face to face with the problem of where it was going to buy its milk, having been notified that the exclusive pooling plan was to go into operation on April first. From its own standpoint it believed that the pooling plan was an advantage because it enabled it to pay for milk it purchased on a blended price in accordance with the use to which it actually was put. A month or more prior to April first it was apparent that a large majority of the regular Borden patrons had become members of the Co-operative Association and that eighty per cent of its grade A milk producers were members — grade A milk being an important feature of the Borden business. It had the alternative of either shutting off such of its old patrons as did not join the pool, or else shutting off those that had joined and going after new ones. The great preponderance of poolers among its patrons seemed to settle the matter and it made its contracts with the pooling association. To the extent that the Borden Company urged its patrons to join the pool, it was perhaps taking sides in the controversy but it does not appear that it did this until a large majority of its patrons had already joined and it does not seem unreasonable that it might try in this way to keep all of its old patrons that it could. I cannot on the evidence convict the Borden Company of complicity in any scheme to force its patrons to join the pool and it certainly had a legal right to purchase its milk of any individual or group of individuals that it wished and for any reason that it wished to assert. (*Locker* v. *American Tobacco Co., supra; Park & Sons Co.* v. *National Druggists' Assn., supra.*)

Both defendants have urged upon my attention that the plaintiff has not shown any money damage or any likelihood of irreparable damage being done to him and that he, therefore, has no standing in a court of equity but must sue for his damages at law if he has any.

I am also urged to consider that all the questions which we have to deal with concern interstate commerce inasmuch as the milk from the Westmoreland station is shipped through New Jersey on its journey to New York, and that, being interstate commerce, it is subject only to Federal statutes and Federal courts and cannot be considered at all in this court.

I have examined the cases submitted to me on these two points, but in view of the decision on the main questions involved it is not necessary to pass upon them.

I will pass upon findings in accordance with the foregoing conclusions, which may be presented by any party.