ALEXANDER'S DEPARTMENT STORES, INC., Plaintiff, *v.* OHRBACH'S INC., et al., Defendants.

Supreme Court, Special Term, Bronx County, January 27, 1943.

*Leo J. Bondy* and *J. Norman Lewis* for plaintiff.

*Kresel, Hershkopf, Marin & Meyerson* for Ohrbach's Inc., defendant.

*Goldwater & Flynn* for Siegel Brothers Kiki Maid Koats Inc., and another, defendants.

SHIENTAG, J.   This is a suit in equity charging conspiracy in restraint of trade and other alleged unlawful conduct, brought by the plaintiff Alexander's Department Stores, Inc. (hereafter called " Alexander's "), against the defendants Ohrbach's Inc. (hereafter called " Ohrbach's ") and Siegel Brothers Kiki Maid Koats Inc., and Leeds Ltd. Coats Inc. (hereafter called " Siegel and Leeds ").

Alexander's is a department store with two branches, in the borough of The Bronx, specializing in apparel for men, women and children.   Ohrbach's is likewise engaged in the sale at retail of articles of clothing, particularly women's, children's

and infants' wear. It has a store at Union Square, in the borough of Manhattan, and another in Newark, New Jersey.

Siegel and Leeds are manufacturers and distributors of ladies' coats and suits. Among the articles manufactured by Siegel and distributed by Leeds is a double-lining woman's coat, or what has been called a "double action" coat, made up in various styles and distinctive designs, with a patented elastic arrangement in the back of the coat to permit free movement by the wearer.

Siegel and Leeds, while operating as two corporations, are in fact parts of a single Siegel enterprise. Indeed, Leeds is an affiliate of the Siegel concern and in no way a competitor. Throughout the trial they were treated, and properly so, as one concern, and not as separate and distinct entities.

For about seven years Alexander's had purchased substantial quantities of coats from Siegel and Leeds, and for the past two years these purchases included the "double action" coats which have been mentioned. For the seven years Alexander's purchases of coats from Siegel and Leeds amounted to a total of upwards of $325,000. Ohrbach's has been doing business with Siegel for about eighteen years, and for the past seven years its purchases from Siegel and Leeds have been upwards of $1,850,000.

In the early part of October, 1942, Siegel and Leeds refused to sell Alexander's any more of their merchandise, including their "double action" removable-lining coats. Alexander's contends that this refusal was due to a conspiracy and unlawful arrangement between Ohrbach's on the one hand, and Siegel and Leeds on the other, maliciously to injure the plaintiff in its business and to boycott the plaintiff. Alexander's also sues for an injunction and damages on the ground that such conspiracy and arrangement were in furtherance of a monopoly and in restraint of trade, in violation of the laws of this State, more particularly section 340 of the General Business Law and section 580 of the Penal Law. The defendants deny any such conspiracy or unlawful arrangement.

Ohrbach's and Alexander's are in a class of stores in New York known as "under-selling" stores, which cater to the more popular trade. According to the testimony, retail stores in the wearing-apparel trade seek, where possible, to enter into arrangements whereby manufacturers from whom they purchase undertake to confine to a given store, exclusively, garments of distinctive design, style or fabric. In some cases a manufacturer's entire line may be limited to one or two stores

in a locality. In a large city like New York, so-called "exclusive" arrangements apply to competitive stores in the same class. These arrangements, often informally entered into, are lived up to, more or less, according to the exigencies of the situation, sometimes representing a hope rather than an expectation on the part of both the retailer and the manufacturer concerned.

Ohrbach's, early in its dealings with Siegel and Leeds, had such "exclusive" arrangements as against competitors in its field in Manhattan. When Ohrbach's sought to have the exclusive arrangement extended to include one of the moderate-price stores in Brooklyn, Siegel refused. When Alexander's had developed its store in the Bronx to the point of becoming a factor in the trade, Ohrbach's also asked Siegel to have their exclusive arrangement apply to the Alexander's store and Siegel for some time refused. Finally, several years ago, he yielded to Ohrbach's request. Certain styles were set aside as "exclusives" for Ohrbach's, among them, at a later date, some of the "double action" coats. Through a misunderstanding, as Siegel claims, some of the same styles of "double action" coats which had been reserved for Ohrbach's were sold by Siegel and Leeds, in 1942, to Alexander's. Ohrbach's complained; Siegel called on Alexander's to return all of the coats, and Alexander's promised, but failed to do so.

This brought the whole controversy to a head and Siegel was squarely presented with the problem of having to choose between the two concerns who had been his customers. He had no complaint to make about Alexander's except its conduct in failing to return the "double action" coats which had precipitated the controversy with Ohrbach's that had been brewing for some time. Alexander's was a good and valued customer, but Ohrbach's was an older and much larger account. Siegel wanted to keep both if he could. He took the matter up with the two concerns. He suggested to Alexander's that perhaps the whole difficulty could be solved if Alexander's would sell the identical Siegel and Leeds merchandise at a slightly higher price than Ohrbach's was selling it, say about a dollar a garment (the "double action" coats were then being sold by both stores for $32.50).

Alexander's refused, and properly so; it saw no reason why it, in the Bronx, should yield any advantage to Ohrbach's in Manhattan. There is a sharp conflict in the testimony concerning what Siegel said in his talks with the president of Alexander's. It is fairly clear, however, that no threat was made

that Alexander's would be put out of business if it did not agree to raise its price in the manner indicated. On the whole I accept Siegel's version of what took place. Of course, it is difficult to prove any conspiracy. Those engaged in it do not proclaim their purpose and design from the housetops. For that reason a wide latitude in proof was allowed.

This much is certain: Siegel was no conspirator. He had no animus against Alexander's; quite the contrary. All that can be said of Siegel is that he was concerned primarily about his own material advantage. He did what he thought was best for himself.

What part did Ohrbach's play in this situation? It, not Siegel, took the initiative. It, not Siegel, wanted Alexander's eliminated as a competitor in Siegel and Leeds coats. While there is no evidence that it made any definite binding agreement as to its future purchases from Siegel and Leeds, Ohrbach's undoubtedly entered into an agreement with Siegel in connection with which it gave him certain assurances concerning the business it would give him if he stopped selling his coats to Alexander's.

Siegel was in a difficult position. He feared that unless he stopped selling his coats to Alexander's he would lose the Ohrbach account in whole or in part. In effect, Ohrbach's and Alexander's both bid for the privilege of continuing to sell the Siegel and Leeds line. Ohrbach's, with its stronger economic position, outbid Alexander's.

However we may feel about it, we are not concerned with the problem of business ethics here involved. Our sole concern is whether the conduct of Ohrbach's and Siegel and Leeds was in violation of the law of this State. In determining this question, certain fundamental principles must be kept in mind.

This is not a suit under the Sherman, the Clayton or the Robinson-Patman Acts. (U. S. Code, tit. 15, §§ 1–7, 12–27, 44; tit. 18, § 412; tit. 28, §§ 381–383, 386–390; tit. 29, § 52.) This court is not called upon to determine whether there has been any violation of the Federal statutes or to adjudicate the rights and obligations of the respective parties under the Federal law. The complaint and the trial proceeded upon the theory that the transactions were entirely intrastate in character and were to be judged by the laws of this State. While Ohrbach's did buy Siegel and Leeds coats for its Newark store, the entire litigation turned on the conduct of its New York store and the arrangement made concerning it. (*Barns* v. *Dairymen's League Co-op. Assn., Inc.*, 220 App. Div. 624, 635; *Marsich* v. *Eastman Kodak Co.*, 244 App. Div. 295, affd. 269 N. Y. 621.)

It must be borne in mind also that Alexander's did not have a subsisting contract of any kind with Siegel and Leeds. The relationship between those parties was one at will, terminable by either party without liability to the other. Under such circumstances, Ohrbach's action in inducing Siegel to refuse further orders from Alexander's would not, in and of itself, be unlawful. (*Biber Bros. News Co.* v. *N. Y. Evening Post*, 144 Misc. 405.)

It may be laid down as a general principle, fundamental in character, having in mind the product here involved, that under our law " It is unquestionable that the owner of property may sell to whom he chooses." (*Locker* v. *Amer. Tobacco Co.*, 195 N. Y. 565.) This applies to buyers and sellers alike. (*Eastern States Lumber Assn.* v. *United States*, 234 U. S. 600; *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290.) A corollary to this principle is that a seller of private property may, for *bona fide*, legitimate business reasons, confine his line in whole or in part to a particular buyer. (*Park & Sons Co.* v. *Natl. Wholesale Druggists' Assn.*, 175 N. Y. 1.)

It is urged that a conspiracy was entered into by Ohrbach's and Siegel and Leeds maliciously to injure Alexander's in its business. As has been pointed out Siegel and Leeds, not having any contractual arrangement with Alexander's, had the right at any time to stop doing any more business with that concern. " It is the right, ' long recognized ', of a trader engaged in an entirely private business, ' freely to exercise his own independent discretion as to parties with whom he will deal.' *. * * Thus a retail dealer ' has the unquestioned right to stop dealing with a wholesaler for reasons sufficient to himself.' * * * He may lawfully make a fixed rule of conduct not to buy from a producer or manufacturer who sells to consumers in competition with himself. * * * Such other wholesaler or retailer has the reciprocal right to stop dealing with the manufacturer. This each may do, in the exercise of free competition, leaving it to the manufacturer to determine which customer, in the exercise of his own judgment, he desires to retain." (*Fed. Trade Comm.* v. *Raymond Bros.-Clark Co.*, 263 U. S. 565, 573.)

Ohrbach's, under the common law, and apart from statute, had the right to enter into an arrangement with Siegel and Leeds to induce the latter to stop doing business with Alexander's and to confine their merchandise to Ohrbach's. Our Court of Appeals has gone so far as to hold — unrealistically, it has been urged by some, but on strong authority — that before a lawful

act can be held to have become unlawful because of the intent which prompted it, the genesis of the act must not only be malicious, but also must be unmixed with any other purpose and exclusively directed for the injury and damage of another. (*Beardsley* v. *Kilmer,* 236 N. Y. 80, 89.)

It is unnecessary to resort to this extreme rule. Even its critics agree with the following statement of the law on the subject: " An agreement entered into for the primary purpose of promoting the interests of the parties is not rendered illegal by the fact that it may incidentally injure third persons. Conversely, an agreement entered into for the primary purpose of injuring another is not rendered legal by the fact that it may incidentally benefit the parties. As a general rule it may be stated that, \* \* \* when such injury or oppression is merely incidental to the carrying out of a lawful purpose, it is not a conspiracy." (*Natl. Fireproofing Co.* v. *Mason Builders' Assn.,* 169 F. 259, 265.) Clearly, whatever arrangement was made between Ohrbach's and Siegel and Leeds had for its primary purpose a benefit to the parties who entered into it. That it may incidentally have hurt or injured Alexander's does not stamp it with the stigma of illegality. (*Natl. Protective Assn.* v. *Cumming,* 170 N. Y. 315, 326, 330, 331; *Lough* v. *Outerbridge,* 143 N. Y. 271, citing with approval *Mogul SS. Co., Lim.* v. *McGregor,* 21 Q. B. D. 544, affd. 23 Q. B. D. 598, affd. [1892] A. C. 25.)

Nor has Alexander's established its claim of an unlawful boycott. " As usually understood a boycott is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial business intercourse, through threats that, unless those others do so, the many will cause similar loss to them." (*Toledo A. A. & N. M. Ry. Co.* v. *Pennsylvania Co.,* 54 F. 730, at p 738.) Siegel and Leeds were the only manufacturers of coats who refused to deal with Alexander's. Whatever attempts Ohrbach's made to have two other smaller manufacturers of coats agree not to sell to Alexander's any style of garments they sold to Ohrbach's failed of accomplishment. Confronted with the choice, those two manufacturers continued to sell to Alexander's. They chose to deal with Alexander's as Siegel and Leeds chose to deal with Ohrbach's. Such action does not constitute an illegal boycott. (*Park & Sons Co.* v. *Natl. Wholesale Druggists Assn.,* 175 N. Y. 1.)

The plaintiff has likewise failed to establish a conspiracy to create or to further a monopoly. Siegel and Leeds, though

large manufacturers, did not control the market in women's coats. Their output was but a small part of the product as a whole. Alexander's has bought and continues to buy from other manufacturers of coats. It is against combinations and arrangements which tend to control the sale or distribution of an entire product, or substantially all thereof, that the anti-monopoly statutes are directed. So far as this record shows, Siegel and Leeds are the only manufacturers of coats any-where in this country who have refused to deal with Alex-ander's. So far as this record shows Alexander's has been able to buy all the women's coats it desired. Other manu-facturers produced double-lining women's coats and their out-put was available to Alexander's. True, Alexander's could no longer obtain the distinctive Siegel and Leeds " double action " coats with their patented free-movement back. But I am aware of no case holding that there is such a thing as an unlawful monopoly of a particular style or design of woman's coat or even of the entire product of a particular manufacturer whose output, though large, is merely a small part of the product as a whole. (*Great A. & P. Tea Co.* v. *Cream of Wheat Co.*, 227 F. 46, 48, 49; *Cummings* v. *Union Blue Stone Co.*, 164 N. Y. 401; *People* v. *Masiello*, 177 Misc. 608; *Locker* v. *Amer. Tobacco Co.*, 195 N. Y. 565.)

We come now to the final claim of the plaintiff, that the arrangement between the defendants was an unlawful restraint of trade and an interference with competition under section 340 of the General Business Law, section 580 of the Penal Law and section 23 of the Stock Corporation Law. An arrange-ment condemned by these statutes is unlawful even if it does not rise to the dignity of contractual obligation. Section 340 of the General Business Law is the statute of broadest applica-tion. That statute, which is little more than a codification of the common law on the subject (*Matter of Davies*, 168 N. Y. 89), was never intended to apply to an agreement between a single manufacturer (especially where monopoly is not involved) and a single dealer. Its strictures are addressed to a combination of, or arrangement between, two or more competitors. · (*Locker* v. *Amer. Tobacco Co.*, 121 App. Div. 443, 456. See, also, *Straus* v. *Amer. Publishers' Assn.*, 85 App. Div. 446, affd. 177 N. Y. 473; *Marsich* v. *Eastman Kodak Co.*, 244 App. Div. 295, 296, affd. 269 N. Y. 621.) " A refusal to sell to any particular individual· becomes illegal only when it is done in pursuance of a combination with other owners to injure the individual with whom they refuse to deal." (*Locker* v. *Amer. Tobacco*

*Co.,* 195 N. Y. 565, 566.) '' The act was evidently intended to prevent manufacturers or dealers in any article or commodity of common use from combining together to advance the price of such article or commodity by which competition in the supply or price of the same would be restricted or regulated.'' (*Walsh* v. *Dwight,* 40 App. Div. 513, 517.) In *Marsich* v. *Eastman Kodak Co.* (244 App. Div. 295, 296, *supra*) the court distinguished that case from the case of *Straus* v. *Amer. Publishers' Assn.* (85 App. Div. 446, affd. 177 N. Y. 473, *supra*) by pointing out, '' An agreement was there involved between several producers or publishers and groups of dealers under which a price scale of the products of the several publishers was sought to be maintained. That is not this case.''

Much of what has been said with respect to restraint of trade applies to the contention of the plaintiff that the arrangement between the defendants constitutes, in effect, unlawful price fixing. At common law, and under the statutes invoked in this action, horizontal price fixing, or price fixing among competitors, actual or potential, was banned.

In dealing with vertical agreements between a single manufacturer and his retailers fixing resale prices, our courts, before the passage of the Feld-Crawford Act (L. 1935, ch. 976, now General Business Law, §§ 369-a–369-e), did not follow the Federal cases on the subject, but steadily upheld the legality of such agreements at common law and under our statutes. '' A contract involving intrastate transactions, made by a single producer with a group of dealers for the maintenance of a price scale on its products * * * does not conflict with the statute (General Business Law, § 340), is not illegal, and, therefore, affords no basis for a claim of damages by one claiming to be aggrieved thereby.'' (*Marsich* v. *Eastman Kodak Co.,* 244 App. Div. 295, 296, affd. 269 N. Y. 621.)

In *United States* v. *Trans-Missouri Freight Assn.* (166 U. S. 290, 320, 321), it was held, in the absence of a specific statute on the subject, that '' The trader or manufacturer, * * * carries on an entirely private business, and can sell to whom he pleases; he may charge different prices for the same articles to different individuals; he may charge as much as he can get for the article in which he deals, whether the price be reasonable or unreasonable; he may make such discrimination in his business as he chooses, and he may cease to do any business whenever his choice lies in that direction.''

In the Federal domain, this broad principle of the common law has been modified by peace and by war emergency statutes. The Act creating the Federal Trade Commission (U. S. Code, tit. 15, §§ 41–51) and the Robinson-Patman Act (U. S. Code,

tit. 15, §§ 13–13b, 21a) are illustrations of the type of legislation prohibiting the discriminations and unfair trade practices tolerated at common law. In this State an instance of such legislation, much more limited and restricted in its scope, is section 101-b of the Alcoholic Beverage Control Law, subdivision 2, paragraph (a), of which provides: " 2. It shall be unlawful for any person privileged to sell liquors or wines to wholesalers or retailers (a) to discriminate, directly or indirectly, in price, in discounts for time of payment or in discounts on quantity of merchandise sold, between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing liquor or wine bearing the same brand or trade name and of like age and quality."

The Feld-Crawford Act, enacted in this State in 1935, applies only to so-called branded or " identified " merchandise. If anything, this law gives added recognition to the validity of vertical price-fixing in this State. (*Port Chester Wine & Liquor Shop, Inc.* v. *Miller Bros.*, 253 App. Div. 188, affd. 281 N. Y. 101.) The Act does not require fixing of resale prices; it is permissive only. It does not specifically require uniformity of any resale prices fixed in a contract for any given area. It has nevertheless been held that such uniformity is implicit in the statute. (*Calvert Distillers Corp.* v. *Nussbaum Liquor Store, Inc.*, 166 Misc. 342, 346.) This requirement of uniformity exists because the Act permits enforcement of the resale price not only against the immediate party with whom the brand owner is privy, but also against others who willingly and knowingly advertise, offer for sale and sell the commodity at less than the stipulated retail price (see section 369-b of the General Business Law), and because retailers are permitted to seek redress against competing retailers for violation of the vertical price-fixing arrangement. (*Port Chester Wine & Liquor Shop, Inc.* v. *Miller Bros.*, supra.)

It is clear, however, that the Feld-Crawford Act, by implication, requires uniformity of prices only if a producer seeks to avail himself of its provisions. It does not change the common-law ruling in this State permitting a producer to fix any price for the resale of merchandise, whether it be " identified " or " unidentified." At best the Act implements the producer's common-law right in this State to fix resale prices by extending the means and scope of enforcement where the goods are " identified."

In point of fact, however, we are not here dealing with any arrangement, entered into between a single manufacturer and his retailers, fixing prices. We are here concerned with an

arrangement between the manufacturers, Siegel and Leeds, and their customer, Ohrbach's, to confine the manufacturers' product to Ohrbach's and to stop selling that product to Alexander's. That, we have seen, is, under the law of our State, a valid arrangement and is not tainted with illegality because for business reasons it was urged upon the manufacturers by Ohrbach's, a competitor of Alexander's.

It would serve no useful purpose to analyze the many cases cited by the plaintiff in support of its contentions. Most of them are clearly distinguishable from the case at bar. They are cases dealing with invalid horizontal agreements between competing producers or competing merchants; they involve the monopoly of substantially an entire product; they treat with price discriminations condemned by the Federal Clayton Antitrust Act, as amended by the Robinson-Patman Act, which are not the basis of this action; or they deal with criminal prosecutions for conspiracy where an " attempt " is sufficient for conviction.

It is true that it has been the policy of the courts to check an unlawful restraint of trade in its incipiency rather than to wait for its fruition. But we have no such unlawful restraint, under the authorities which now prevail in this State. We hold that, in general, where two persons are in competition with each other for patronage of a third person, whether he be seller or buyer, there is no liability for one competitor's inducing that third person to refrain from dealing with the other.

This may hurt the other competitor; it may affect competition to a limited extent so far as the public is concerned, but where the arrangement is by a single manufacturer, especially where no monopoly is involved, or where it is a vertical rather than a horizontal arrangement, it has thus far been the policy of this State to countenance the arrangement. All that can be said is that Ohrbach's, by exercising its economic power in a very limited field, has obtained a possible advantage over Alexander's, and that there is an absence of any showing that as a result of this advantage competition has been or is likely to be seriously affected. Alexander's is still left untrammeled to compete with Ohrbach's in the sale of women's coats generally. The mere statement of this rule should serve as a caveat to the defendant Ohrbach's and others similarly situated. Conduct designed to widen or extend the field of advantage, through the exercise of economic power, may be fraught with danger and may even invite disaster. Such action might well " lead a court in good conscience to say that a given set of defendants

were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men." (*Barns* v. *Dairymen's League Co-op. Assn.*, 220 App. Div. 624, 640.)

As was stated by Mr. Justice HUGHES in construing the Sherman Antitrust Act (U. S. Code, tit. 15, §§ 1–7, 15): " * * * a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment * * *. The question of the application of the statute is one of intent and effect, and is not to be determined by arbitrary assumptions." (*Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344, 360, 361.) Most distinctions, as Mr. Justice HOLMES said, are distinctions of degree and are none the worse for it (dissenting opinion in *Haddock* v. *Haddock*, 201 U. S. 562, 631). That is particularly true in cases of the type we are here considering.

Judgment is directed in favor of the defendants, dismissing the complaint on the merits, with costs. Exception to the plaintiff. Settle judgment in accordance with the foregoing determination.