ALEXANDER'S DEPARTMENT STORES, INC., Appellant, *v.* OHR-BACH'S INC., et al., Respondents.

First Department, July 2, 1943.

*Edward R. Finch* of counsel (*J. Norman Lewis* and *Edward Kurland* with him on the brief; *Leo J. Bondy,* attorney), for appellant.

*Isidor J. Kresel* of counsel (*Wm. Peyton Marin* with him on the brief; *Kresel, Hershkopf, Marin & Meyerson,* attorneys), for respondent Ohrbach's Inc.

*Monroe Goldwater* of counsel (*Milton Small* with him on the brief; *Goldwater & Flynn,* attorneys), for respondents Siegel Brothers Kiki Maid Koats Inc. and Leeds Ltd. Coats Inc.

DORE, J. Plaintiff appeals from a judgment dismissing the complaint on the merits after trial in an action for an injunction and damages charging defendants with making an arrangement between them to eliminate plaintiff's competition in garments made by defendant manufacturers in violation of section 340 of the General Business Law.

Plaintiff (herein designated " Alexander ") operates two retail stores in the borough of Bronx, New York, specializing in women's apparel at the popular or so-called " underselling " price range. Defendant Ohrbach's Inc. (herein designated " Ohrbach ") also operates two retail stores of the same general character, one at 14th Street, borough of Manhattan, New York; the other in Newark, New Jersey. The issues do not relate to the Newark store. Defendants, Siegel Brothers Kiki Maid Koats Inc. and Leeds Ltd. Coats Inc. (herein designated " defendant manufacturers ") are makers of widely advertised women's coats and suits.

Ohrbach has been doing business with defendant manufacturers for thirteen or fifteen years and for the seven years prior to September, 1942, purchased from them an aggregate of $2,200,000 of merchandise. Alexander has been doing business with the same manufacturers for seven years and during that time purchased from them $326,500 of their products.

Among other articles, defendant manufacturers sold a reversible lining ladies' coat with patented elastic gusset, nationally advertised as a " Double-Action " coat and sold in most of the leading stores including the so-called better type stores where the coat retails at higher prices.

Ohrbach's settled policy, consistently followed for many years, is to undersell all stores in its class. There have been

occasional price wars between underselling retailers in which garments were finally sold far below cost price. Ohrbach claims that to avoid such price wars, retailers thereafter refused to reorder the same garment with a consequent loss of business to manufacturers.

From time to time, Ohrbach has endeavored to obtain exclusive arrangements by buying from manufacturers on the express condition that the same coat, style or fabric would not be sold to a competing store. These arrangements were referred to in the evidence as " exclusives " and they are sought by other underselling stores as well as Ohrbach.

When Alexander began to emerge as a keen competitor of Ohrbach, the latter complained to defendant manufacturers against selling Alexander identical garments which Ohrbach believed should be confined to it. The complaints increased until in the latter part of 1940, Ohrbach's president vigorously complained to Mr. Siegel, president of both defendant manufacturers (Siegel and Leeds being affiliated), about Alexander's competition with Ohrbach in the same garments. Siegel attempted to compose the differences of his two retail customers so as to hold both. Among other things he tried to get Alexander to raise the price of its garments so as to be higher than Ohrbach's price, but Alexander refused.

Finally, in September, 1942, a conference was held, at which Ohrbach's president, Siegel, and others were present. As a result of that conference Siegel promised Ohrbach that neither of defendant manufacturers would sell any of their products to Alexander, and Ohrbach assured Siegel that if he made the arrangement he need not worry about surplus and end of season lots and that Ohrbach would make up, by its orders, any loss defendant manufacturers would sustain by refusing to sell any of their products to Alexander. Thereafter and in pursuance of the arrangement made with Ohrbach defendant manufacturers refused to sell merchandise to Alexander and this action was instituted.

As the agreement here involved is exclusively intrastate, we do not consider Federal statutes or decisions thereunder.

Defendants contend that assuming (without conceding) that the arrangement charged was made, an agreement between one retailer with what is, in effect, a single producer, not to sell his products to another retailer is not within the condemnation of section 340, as each of the parties is merely serving his own legitimate commercial interests and any incidental damage to the other retail competitor is not actionable though defendants act in concert.

On appeal Alexander makes no claim of monopoly, boycott or price fixing, but limits its charge essentially to restraint of competition in violation of section 340 of the General Business Law. That section, as far as relevant, provides: ".1. Every contract, agreement, arrangement or combination whereby

\* \* \* \* \* \* \*

" Competition or the free exercise \* \* \* in this state in the manufacture, production \* \* \* or sale \* \* \* of any \* \* \* article \* \* \* is or may be restrained or prevented

" \* \* \* is hereby declared to be against public policy, illegal and void. " In interpreting the statute the rule of reason should be applied; the court in each case must scrutinize the particular conditions and purposes revealed by the evidence. In our opinion this record establishes that defendants entered into the arrangement charged, and on all the facts and circumstances disclosed, we think it is within, not merely the precise language, but the purpose and intent of the act.

This is not a case of a manufacturer *freely* refusing to sell his products to a particular retailer. Nor is it the case of a manufacturer giving one retailer a so-called " exclusive " on merely one fabric, style or garment. On the contrary, we think the evidence shows that Ohrbach, using its superior economic buying power, finally prevailed upon defendant manufacturers to refuse to sell to Alexander, not merely one line or fabric, but any merchandise whatever, and that the object and effect of such arrangement were to destroy Alexander as a competitor of Ohrbach in defendants' products which Alexander had been selling for years. We think, too, the record sufficiently indicates that what Ohrbach has achieved by the combination against Alexander, it has tried to accomplish against other competitors.

The combination attacked herein was not the so-called vertical agreement by which a producer arranges with retailers to maintain a price on his products as in *Marsich* v. *Eastman Kodak Co.* (244 App. Div. 295, affd. 269 N. Y. 621). It is more analogous to what was condemned in *Bertini* v. *Murray* (262 App. Div. 893, appeal dismissed 287 N. Y. 751). In that case some of the defendants had refused to sell ice to the plaintiffs who had previously bought ice from subdistributors of the Ice Refrigeration Corporation, Knickerbocker Ice Company and Rubel Corporation, and these last-named companies tried to compel plaintiffs to continue to purchase from such subdistributors. The court held that the refusal to sell to plaintiffs was in furtherance of an arrangement between the defendants to

restrain or prevent the free exercise of marketing and selling of ice, and granted an injunction restraining the three defendants from refusing to sell ice to plaintiffs. The case was decided under that part of section 340 of the General Business Law, which makes unlawful action restraining or preventing the free exercise of either marketing or selling.

There are, it is true, other coat manufacturers from whom Alexander can purchase ladies' coats and garments. But defendant manufacturers' garments, the "Double-Action" detachable lining coats in particular, are, it is claimed, among the best in the market, widely advertised, obviously of considerable benefit to any underselling store, as such garments are also sold at many higher priced stores throughout the city of New York, and especially valuable to a retailer who has built up good will for them among his own customers for many years.

A manufacturer has a right to pick his own customers and refuse to sell to a particular customer provided that such refusal is not the result of a combination with others to destroy competition so far as the whole product of important manufacturers is concerned. We think that section 340 was intended to prevent the practice that Ohrbach here engaged in, whereby a larger competitor using the pressure of superior buying power seeks to eliminate one by one smaller competitors by seeking arrangements with manufacturers, such as the one here in question, to refuse to sell to competitors and cut off their supply, though they have been buying the products and competing in them for years.

Ohrbach's claim of the lack of any intent to injure Alexander in making the arrangement must be weighed in the light of the fact that Ohrbach's president, frequently mentioned in the testimony, called by his own employee "the head of the business," and indeed the prime mover of the whole arrangement, failed to take the stand and testify. In *Peekskill Theatre, Inc.,* v. *Advance Theatrical Co.* (206 App. Div. 138) this court, granting an injunction restraining defendant motion picture producers therein from inducing or coercing distributors not to deal with the plaintiff theatre, said (at p. 140): "Where a wrong is being perpetrated for malicious purposes, the court will not look for technical reasons to refuse relief; but, on the other hand, speedy relief should be granted, both that the plaintiff may be protected and that the public may learn that the principles of fair play and free competition are a part of the fundamental and the statutory law of this State and nation."

While no personal malice was shown, the acts complained of

were planned and deliberate and as this court said in the *Peekskill Theatre* case (*supra*) at p. 142: " * * * the law condemns all acts trespassing upon the legal rights of others as malicious, as matter of law, and will grant reparation in damages, or an injunction * * *."

To establish infringement, it is not necessary to show monopoly. As was said in *Barns* v. *Dairymen's League Co-operative Assn., Inc.* (220 App. Div. 624, 640), there must appear " at least some of the circumstances which would lead a court in good conscience to say that a given set of defendants were overstepping the bounds of reasonable ambition and fair play and were becoming a nuisance to their fellow men."

The judgment appealed from should be reversed, with costs to the appellant, and judgment directed in plaintiff's favor vacating the arrangement between Ohrbach and defendant manufacturers and enjoining defendants from carrying out such arrangement; and appointing a referee to compute plaintiff's damages, with costs.

MARTIN, P. J., and UNTERMYER, J., concur; COHN and CALLAHAN, JJ., dissent and vote to affirm on the opinion of Mr. Justice SHIENTAG at Special Term.

Judgment reversed, with costs to the appellant, and judgment directed in plaintiff's favor vacating the arrangement between Ohrbach and defendant manufacturers and enjoining defendants from carrying out such arrangement; and appointing a referee to compute plaintiff's damages, with costs. Settle order on notice.