ALEXANDER'S DEPARTMENT STORES, INC., Respondent, *v.* OHRBACH'S, INC., et al., Appellants.

First Department, June 15, 1945.

*John W. Davis* of counsel (*Edward Lazansky, Isidor J. Kresel* and *Wm. Peyton Marin* with him on the brief; *Isidor J. Kresel,* attorney), for Ohrbach's, Inc., appellant.

*Monroe Goldwater* of counsel (*Harry Rodwin* and *Bernard Katz* with him on the brief; *Goldwater & Flynn,* attorneys), for Siegel Bros. Kiki Maid Koats, Inc., and Leeds Ltd. Coats, Inc., appellants.

*Edward R. Finch* and *Samuel Seabury* of counsel (*J. Norman Lewis* with them on the brief; attorney), for respondent.

DORE, J. Defendants appeal from judgment awarding plaintiff damages in the sum of $227,755.55, with interest of $7,735.80, totalling $235,491.35, after a trial solely on the issue of damages before an official referee.

Plaintiff sued to restrain defendants from carrying out a conspiracy to cut off entirely plaintiff's supply of garments manufactured by defendants Siegel and Leeds and thus eliminate plaintiff's competition in such merchandise with defendant Orbach's, Inc. After trial, judgment was directed in defendants' favor, dismissing the complaint on the merits (180 Misc. 18). This court reversed, holding that section 340 of the General Business Law had been violated, and directed entry of an interlocutory judgment in plaintiff's favor (266 App. Div. 535). That judgment enjoined defendants from carrying out the arrangement to restrain competition and appointed an official referee " to hear and determine and compute " plaintiff's damages. Appeal to the Court of Appeals was dismissed (291 N. Y. 707). The Official Referee thereafter held hearings on the amount of the damages and rendered the judgment from which this appeal is taken (181 Misc. 839).

At the outset defendants contend that the entire proceedings before the Official Referee are void because this court lacked jurisdiction to direct a compulsory reference before an official

referee to hear and determine the issue of damages. Outlining the history of statutes relating to compulsory reference, appellants urge that, in the absence of consent, such reference to hear and determine is not authorized except when the trial requires the examination of a long account as the immediate object of the suit; and that an assessment of damages, even of numerous items, does not constitute an account, technically speaking, between the parties.

Cases in which actions as a whole were thus referred have no application. Here all issues were decided on their merits by the court itself, leaving for determination by the Referee only the amount of damages. '' An allegation of damage is not * * * a traversable allegation. * * * The practice upon an assessment of damages * * * is governed by the rules of the common law.'' (*McClelland* v. *Climax Hosiery Mills*, 252 N. Y. 347, 351, 353.) Reference to an official referee for the assessment of damages has long been a common practice. The Rules of Civil Practice and Civil Practice Act provide for assessment of damages by referees in case of default (Civ. Prac. Act, § 490), after granting summary judgment (Rules Civ. Prac., Rule 113), and for ascertainment of damages sustained by reason of an injunction. (Civ. Prac. Act, § 894.)

Section 116 of the Judiciary Law empowers the Supreme Court to designate official referees '' to hear and report * * * or to hear and determine '' any action or claim '' referable by statute or the rules and practice '' of the court. Section 117 of that law provides (with an exception not relevant) that all proceedings submitted to an official referee, either by stipulation '' or order of the court '', shall be deemed duly referred and, in addition to all the powers now conferred by section 469 of the Civil Practice Act, the referee '' shall proceed therein with the same power and authority as a justice presiding at a regular special term of the supreme court * * * .''

In *Matter of Brock* (245 App. Div. 5, 10) the court, after reviewing the constitutional and statutory provisions applicable, held that the Judiciary Law authorizes an official referee to act as a justice at Special Term could act, and said: '' The official referee does not act to the exclusion of the Supreme Court, but as a supplement to it and upon its consent. When he exercises the jurisdiction conferred by the statute, he does not do so by way of an invasion of the ' general jurisdiction in law and equity ' of the Supreme Court. That jurisdiction remains unimpaired by the statute. A new agency is created to supplement the machinery of the Supreme Court in the

exercise of its jurisdiction. These statutes do not abridge or decrease the powers of the Supreme Court. They enlarge its capacity by enabling it to utilize, when it so desires, an experienced aide in the exercise of its functions."

In its opinion (266 App. Div. 535, 540) this court merely directed that judgment be entered "appointing a referee to compute plaintiff's damages, with costs." Within that direction, either side could have proposed an order providing for a referee to hear and report. Plaintiff's proposed order included the appointment of an official referee to hear and determine. Defendants' form of order differed in many respects from plaintiff's but contained the same provision for the appointment of an official referee to hear and determine. Defendants generally reserved rights by a notice that their order was not to be deemed a counterorder, but they did not raise or refer to the basic issue of jurisdiction they now urge. After the order was entered, defendants made no motion to reargue nor did they request that the issue of damages be remanded to Special Term or to a referee to hear and report.

On all the facts here disclosed and under the provisions of the Judiciary Law and the practice of the court, we hold this court had jurisdiction to appoint an official referee to hear and determine the sole remaining issue of damages. In any event, as the direction for the reference is contained in the judgment of this court, that may not be reviewed here.

At the reference, defendant Ohrbach's, Inc., claiming that for the above reasons the court had no jurisdiction, appeared specially and did not partake in the trial except as an observer. The other two corporate defendants, Siegel and Leeds, also made a special appearance, but when the Referee properly held that no defendant could retain its special appearance and simultaneously take part in the proceedings and cross-examine witnesses, defendants Siegel and Leeds withdrew their special appearance under protest and appeared generally by taking part in the proceedings and examining witnesses.

Ohrbach now contends that the Referee erred in requiring it to waive its special appearance as a condition of participating in the proceedings on the merits. There is no merit to this contention. The Referee did not require any waivers or prohibit Ohrbach from participating. He applied the settled rule that one cannot appear specially to contest jurisdiction and at the same time participate generally in the trial on the merits. (*Henderson* v. *Henderson*, 247 N. Y. 428, 432). *McClelland* v. *Climax Hosiery Mills* (252 N. Y. 347), relied on by appellants,

has no application. That case involved an assessment of damages after defendant's default in answering. Section 339 of the Civil Practice Act preserves to such defendant the right to partake in an inquiry to ascertain the amount of the plaintiff's damages. Here Ohrbach did not default but appeared specially for the sole purpose of contesting jurisdiction, and had an entirely different status from a defaulting defendant. In a special appearance, defendant contests jurisdiction only. In a default, defendant does not question jurisdiction at all or even liability but is not thereby foreclosed of the right to contest the amount of damages.

Defendants further contend that the judgment should be reversed as the damages assessed were wholly unsupported by competent evidence and embrace unauthorized duplication of alleged elements of damage. The learned Referee allowed damages in the amounts indicated under the following four categories:

I. For loss of net profits on lost sales of Siegel and Leeds merchandise...................... $52,662.38
II. For loss of net profits on lost sales of accessories ..................................... 12,593.17
III. For damage sustained as the result of being deprived of Siegel and Leeds " lines ".......  50,000.00
IV. For loss of 7,500 customers.................. 112,500.00

Total ................................. $227,755.55

The damages involved were the loss of profits plaintiff would have received if the supply had not been unlawfully cut off. There is probably no part of the law of damages more difficult of application than that to be applied in the ascertainment of the proper measure of damages for prospective profits prevented by wrongful interference. This case presents an unusually difficult state of facts.

Defendants rely on the rule of law expressed by SANBORN, C. J., of the United States Circuit Court of Appeals in *Central Coal & Coke Co.* v. *Hartman* (111 F. 96). In that case it was held that damages for unlawful restraint of trade are measured by the difference, if any, between the net profits earned by the plaintiff prior to the interference and the net profits earned after the interference, and that proof of the expenses and the income of the business for a reasonable time before and after the interruption, or facts of equivalent import, are indispensable

to a lawful judgment for damages for loss of anticipated profits of an established business. Defendants contend that as the plaintiff failed to produce all its books and records showing (1) the cost, expenses and resulting net profits of its business for a reasonable time before the wrong complained of, and (2) the cost, expenses and net profits during the interference, plaintiff failed to adduce any competent evidence of damages supported by any underlying data sufficient to sustain any of the items of damage, including the claimed loss of net profit due to the failure to get the garments as a result of the conspiracy.

Plaintiff relies on the rule expressed in *Wakeman v. Wheeler & Wilson Mfg. Co.* (101 N. Y. 205) and in numerous other cases. In the *Wakeman* case the Court of Appeals (EARL, J.) held that where it is certain damages have been caused by a wrong and the only uncertainty is as to the amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the wrong.

Plaintiff in a case like this is not restricted to the ordinary rules for measuring damages or obliged to prove its losses with mathematical certainty or accuracy. Indeed no hard and fast rule for ascertaining prospective profits for the loss of which a recovery may be had can be laid down; such profits must be determined according to the circumstances of each particular case and the subject matter thereof (15 Am. Jur., Damages; § 158).

The law does not halt or surrender because the state of facts is novel " and the ordinary methods of proving values are not available, but will resort to some practical means that will be just to both parties." (*Industrial & General Trust, Ltd.*, v. *Tod*, 180 N. Y. 215, 231; *Central Trust Co.* v. *West India Improvement Co.*, 144 App. Div. 560, 565, 566 [1st Dept.].) The Court of Appeals said in the *Wakeman* case that the damages, being prospective, must to some extent " be uncertain and problematical, and yet on that account a person complaining * * * is not to be deprived of all remedy." As was said in *Bagley v. Smith* (10 N. Y. 489, 499) : " Nor are we the more inclined to refuse to make the inquiry, by reason of its difficulty, when we remember that it is the misconduct of the defendants which has rendered it necessary." In *MacGregor v. Watts* (254 App. Div. 904) the court held: " It is recognized by the courts and by text writers and in digests that a wrongdoer * * * may not escape liability simply because there is * * * none of the ordinary standards for measuring the

damages.'' What was said in *Myers* v. *Sea Beach Railway Co.* (43 App. Div. 573, 577) is here applicable: " * * * The rule that damages which are contingent and uncertain cannot be recovered, embraces only such as are not the certain result of the breach, not such as are the certain result but uncertain in amount.'' (See, also, *Steitz* v. *Gifford,* 280 N. Y. 15, 20; *Eastman Co.* v. *Southern Photo Co.,* 273 U. S. 359, 379; *Dart* v. *Laimbeer,* 107 N. Y. 664, 669.)

Nevertheless, plaintiff seeking compensatory damages had the burden of proof and should have adopted and presented to the court a proper method and basis for ascertaining the damages it sought to recover. (*Janvier, Inc.,* v. *Baker,* 229 App. Div. 679, 680.) On this record we have reached the conclusion that plaintiff's proof is insufficient to support the amounts found by the learned Official Referee on each of the classifications of damages claimed and that accordingly the judgment appealed from must be reversed and a new trial ordered.

> I. Claimed loss of profits on prevented sales of Siegel and Leeds garments in the sum of $52,662.38.

The first classification relates to the loss of net profits from the sales of garments in plaintiff's coat and suit department caused by defendants' illegally cutting off the supply. As the direct result of defendants' unlawful conspiracy this is clearly a proper item of damages if properly proved. Defendants insist upon the uniqueness and desirability of the Siegel and Leeds merchandise. Their conspiracy is an indication of their opinion of the special value of those garments for the retailer, especially in the so-called underselling class of store. Mr. Kane, merchandise manager of Ohrbach's, testified on this trial that possession of Siegel and Leeds garments and sale thereof at prices below the Fifth Avenue stores were great assets to Ohrbach's and very helpful to it in its business, and admitted, though a hostile witness, that it would be helpful to Alexander's store if it carried the same garments. Defendants did not cross-examine. The record establishes, without any proof to the contrary, that cutting off suddenly and completely the supply of such garments, desirable from so many points of view for this particular retailer, was likely to cause substantial damage.

After September, 1942, in pursuance of the wrongful arrangement made with Ohrbach, defendant manufacturers refused to sell any of their merchandise to plaintiff. Mr. Keat, plain-

tiff's treasurer and former comptroller, prepared a summary from plaintiff's retail sales ledger showing (1) the volume of sales in plaintiff's coat and suit department in 1941, 1942 and 1943; (2) the increase of such volume in 1942 by 60% over 1941; and (3) the further increase by 20% in 1943 over 1942. The underlying sales records showing, week by week and cumulatively, the cost price paid the manufacturers, the selling price and the "markup" of the merchandise sold in plaintiff's coat and suit department in 1941, 1942 and 1943, and indicating the percentages of increase above stated, were in court and made available to defendants. The "markup" (of 28%) is a percentage of the selling price, not the cost price; e.g., if a garment sells at $100, $72 is the cost, the markup, 28%, is $28, which covers all overhead except the cost price of the garment. Defendants were in a position to adduce evidence as to the propriety or correctness of such markup in selling that type of merchandise, but they remained mute. The daily records supporting these weekly records were also in court and available to defendants. Defendants admit that the records were kept in the ordinary course of business and were the records from which the computation of the total volume of business was made. After Exhibit 43, showing these weekly records, was offered in evidence, defendants reserved the right of cross-examination of Mr. Keat. When hearings were resumed nearly three weeks later, defendants' counsel said he had examined the exhibit and did not desire to cross-examine. Plaintiff, therefore, contends that defendants had the original records for twenty days, and rested at the close of plaintiff's case without any cross-examination and without calling any witnesses to contradict the plaintiff's proof, and that, therefore, the Referee properly accepted plaintiff's proof and fixed $52,662.38 as the loss of net profit on this item of damages.

The records adduced indicated, for the years in question, the amount of coat sales prevented in the sum, as found by the Referee, of $228,966.90. On the basis of that amount of sales prevented, Mr. Friedman, a partner of Touche, Niven & Co., accountants for leading department stores and plaintiff's accountants for many years, testified to the percentage of profits lost. He was familiar with the costs, overhead, expenses and profits in the plaintiff's business and in that particular department, as he supervised plaintiff's accounting work. He testified generally that after allowing deductions for overhead, selling costs and other expenses, in fact everything except Federal income taxes, plaintiff's net profit on the total of Siegel and

Leeds garments withheld would have been 23% of the selling price or $53,268. The slight difference in the Referee's award of $52,662.38 arises from the fact that the Referee accepted defendants' final computation of $228,966.90, the loss claimed to be shown by plaintiff's own figures, as a more accurate computation of total sales prevented than plaintiff's computation in a slightly larger amount.

In this first item of damages we are concerned only with plaintiff's net profit in the coat and suit department and not in the store as a whole. Plaintiff's coat and suit department had been long established and equipped with material and personnel, and handled many other items in addition to the Siegel and Leeds garments. It is, therefore, understandable that the additional cost of handling the Siegel and Leeds merchandise would not necessarily be very great. The accountant, strictly speaking, was not testifying as an expert but from his knowledge of the facts as a certified public accountant who had examined and audited plaintiff's books for the periods in question. He testified on the basis of facts proved before the court, including the volume of sales, the markup, the percentage of increase and the total sales lost. He also testified on the basis of facts drawn from his knowledge of the expenses required to be deducted to determine the net profit.

But defendants properly point out that Exhibit 43 and the other documents that were in court contain nothing whatever to indicate the *deductible expenses* involved in calculating the net profit. Plaintiff contends that this is no bar to recovery where such net profits are estimated by the person qualified to make the estimate on the basis of records giving a reasonable foundation for a sound estimate. Plaintiff also urges that its books were not kept and the accountant's reports were not broken down to show departmental net profits; that the invoices were in a warehouse not segregated by the name of the supplier but grouped month by month; that there were thousands of them and it would take much time to segregate them, assuming manpower were available; and that the other records called for relating to costs and expenses and profits of the store as a whole were beside the issue on this item, viz., the net profit lost in this one department, and that there was no reason for their production.

But obviously the expenses were considered by the accountant in reducing the 28% markup indicated by the records adduced, to the net profit of 23% claimed to be lost; and the records produced show nothing whatever about these deductible

expenses. Cross-examination would be ultimately futile, for, in the final analysis, the witness would state he based his estimate on his experience and knowledge of the records and none were produced showing anything about deductible expenses. There is no satisfactory proof in this record that some of such records could not be produced.

With nothing before the court to indicate even approximately what the deductible expenses were or how they were calculated and no standard of comparison between the net profits earned before the discrimination and those earned during the period, the proof is insufficient to sustain the damages found.

Defendants contend that plaintiff's losses on Siegel and Leeds garments were compensated by the sale of other competing items through the use of plaintiff's same facilities in its coat department. If plaintiff had shown that favorable trends in the industry reflected in plaintiff's store or other favorable factors helped plaintiff increase its total sales of garments in its coat and suit department, defendants who were wrongdoers would not for such reason alone be exonerated from the charge of inflicting substantial damage otherwise caused, but no such evidence was adduced.

Plaintiff naturally did not wish to reveal its accounting practice to defendant Ohrbach, a keen competitor, and accordingly refused to produce books and records subpœnaed. Plaintiff points out that on the original trial at Special Term Ohrbach for the same reason refused to produce any books whatever and gave only conclusory figures to the trial court. But Ohrbach could be compelled to produce any available records that were material, relevant and necessary. Under the circumstances here shown plaintiff need not have produced all the records demanded, but plaintiff seeking compensatory damages against its competitor and the defendant manufacturers should have produced such records as were reasonably available that were necessary to establish at least with approximation the deductible expenses considered in reaching the percentage of net profits plaintiff claims to have lost by reason of its competitor's wrongful interference.

In *Bertini* v. *Murray* (290 N. Y. 754) the defendants, through an arrangement, withheld ice from peddlers in violation of section 340 of the General Business Law; the issue of damages was tried before an official referee who reported that plaintiffs kept no correct books, made no deductions for increased cost and their conclusions were necessarily nothing more than approximations; but he found damages in the sum

of $6,900; and the Court of Appeals unanimously affirmed. That case, however, may be distinguished from the case at bar as in that action no records were available.

II. Claimed loss of net profits in accessories<br>in the sum of $12,593.17.

On the basis of observation and experience in the business for many years and on the well-recognized business practice of " suggestive selling ", plaintiff's witnesses testified that a woman could spend on accessories (such as hats, gloves, bags, etc., that would go well with a coat) about 25% of the cost of the coat or basic garment she bought. They further testified, on the basis of the prior proof of the total sales prevented, that if plaintiff had not been deprived of the Siegel and Leeds coats it would have sold accessories with those coats in the amount of $57,900, that is 25% of the total sales of coats prevented. Keat, plaintiff's treasurer, testified the markup on accessories was 28.7%. Friedman, the accountant, calculated the net profit on accessories, after deducting everything but Federal income taxes, at 22%. That percentage of $57,900 is $12,738. This sum the Referee allowed as the loss of net profit on the sale of accessories.

If supported by proper proof, the loss of sales on accessories is a proper item of damage. In reason, it is very likely that, when a woman purchases a coat, she buys in the same store some so-called accessories to go with it. Plaintiff's witnesses so testified from their experience and observation over many years and the proved accepted practice of " suggestive selling " in such department stores. Defendants were in the same business but did not see fit to adduce any evidence to contradict this proof. On this record, therefore, the only remaining question is whether the proof adduced was sufficient to support the net percentage of profits claimed to be lost on the sale of accessories.

The proof on this item of damages suffers from the same defects noted in considering the first item. In addition, in the case of the sale of accessories no underlying records whatever were produced showing the average markup claimed. For the reasons above stated, we think plaintiff's proof on this item of damages is also insufficient to support the damages found.

III. Claimed loss of the " lines " in the sum<br>of $50,000.

The loss of the Siegel and Leeds " lines " refers to the damage caused to the reputation and standing of a store such as plaintiff's when customers find they can no longer buy the Siegel

and Leeds garments there, after plaintiff had for many years built up a valuable good will for such garments among its customers. Defendants admit, indeed they insist upon, the distinctive value of the Siegel and Leeds " lines ". The loss of such asset, especially where a good will had been built up in the sale thereof, is, we think, a proper item of damages and an injury in addition to the loss of profits in the prevented sales of the garments and of accessories. In this record, how- ever, the only proof to sustain this item of damage is the opinion of Farkas, plaintiff's president, that it was worth $50,000 to Alexander's. Assuming that such future prospective loss may be recovered, without splitting causes of action, by a plaintiff who is seeking damages only for a definite period (here up to December 31, 1943) there is no sufficient basis of facts proved or assumed in this record to support the opinion of the interested witness as to the amount of damage sustained.

IV. Claimed loss of customers in the sum of $112,500.

Farkas also testified that 7,500 customers were lost by defendants' wrong. Asked to tell what loss in dollars and cents Alexander's sustained from such loss of customers, he answered, " $112,500." This works out mathematically to $15 a customer. He said that figure was based on various compu- tations and statistics issued by the United States Government and the State of New York, but these statistics and computa- tions were not produced and offered in evidence. The proof of damage on this item suffers from the same defect as the proof on the loss of the " lines ".

The damages on the last three items (II, III and IV) relate to damages to the store as a whole. At least in connection with those items we think the accountant on cross-examination should have been permitted to testify what the net profits on the store as a whole were during the years in question and to produce the audits which were apparently available for such years. While such proof would not be conclusive, it was neither incompetent nor irrelevant.

The evidence on the first two items showing the loss in sales of coats and accessories was not, strictly speaking, opinion evidence but represented the observation and experience of men in the business who had claimed knowledge of the facts. But the proof on the last two items, the loss of the " lines " and the loss of customers, depended almost exclusively on opinion evidence, strictly so-called. Judge EARL in the *Wakeman* case (101 N. Y. 205, 217, *supra*) held opinion evidence was properly excluded

in the assessment of damages for loss of prospective profits in that action, stating: " There was no certain basis of facts proved, or facts assumed upon which an opinion could be based."

In *O'Brien* v. *Home Benefit Society* (117 N. Y. 310) an insurance contract was involved where an assessment had not been made and it was impossible for the plaintiff to show accurately what such an assessment would have produced. Evidence was adduced by an insurance expert that an assessment at the rate specified at the time in question would aggregate a named sum of money. EARL, J. (who wrote the opinion in the *Wakeman* case) said that plaintiff was bound to give " such evidence as the nature of the case permitted bearing upon the matter of damages," and added, " We have carefully read the evidence, and we think there was sufficient to justify the verdict of the jury."

Wigmore argues persuasively for the propriety of the use of opinion evidence of qualified experts who can give the triers of the facts appreciable help in the subject under consideration. (7 Wigmore on Evidence [3d ed.], §§ 1917–1923.) Federal courts receive opinion evidence in analogous cases in which the damages for an infringement of a patent or copyright are sought. (*Sheldon* v. *Metro-Goldwyn Corp.*, 309 U. S. 390, 408, 409; *Westinghouse Co.* v. *Wagner Mfg. Co.*, 225 U. S. 604, 617; *Dowagiac Mfg. Co.* v. *Minnesota Plow Co.*, 235 U. S. 641, 647.) In the *Sheldon* case (*supra*, 404, 408), Chief Justice HUGHES held that all that is required is a reasonable approximation which may be attained with the aid of expert testimony, and approved a prior holding which said that in cases of this kind testimony of this nature is " not only helpful but, as we have said, may be indispensable."

In the final analysis, what the court is appraising is the value of the Siegel and Leeds garments to plaintiff, unlawfully deprived of them. As Chief Justice HUGHES said in the *Sheldon* case (*supra*, 409): " We see no greater difficulty in the admission and use of expert testimony in such a case than in the countless cases involving values of property rights in which such testimony often forms the sole basis for decision."

The parties are in equity. Defendants should indemnify plaintiff for any damages that are shown to be the natural and probable result of defendants' wrongful interference; but plaintiff may not have a judgment of vengeance or *in terrorem* of other wrongdoers.

The judgment should be reversed, with costs to the appellants, and a new trial ordered, in accordance with this opinion, before another official referee.

GLENNON and UNTERMYER, JJ., concur; TOWNLEY, J., concurs in result; MARTIN, P. J., dissents in part as follows: The first item of damages amounting to $52,662.38 was properly proved. To that extent the judgment should be affirmed.

Judgment reversed, with costs to the appellants, and a new trial ordered, in accordance with opinion, before another official referee. Settle order on notice reversing all findings not consistent with this determination.