Charles S. Golden,
Off. Ref. By reason of a decision of the Court of Appeals (Madden v. Atkins, 4 N Y 2d 283), Special Term of this court by the Honorable James J. Conroy by order dated November 21, 1958 referred to the undersigned the responsibility to hear and determine the question of damages in accordance with the views expressed in said decision of the Court of Appeals.
The plaintiffs, Bernard C. Madden, Robert A. Liddy, Richard J. Polachek, Arthur Sohnen and David Friedman having been expelled from New York Association No. 88 of Masters and Mates of the National Organization of Masters, Mates and Pilots of America, Inc., and plaintiff Pietro Di Pietrantonio having been denied work opportunities through Local 88, the decision of the Court of Appeals, in pertinent part, stated (p. 297):
“ From what we have said, it follows that the plaintiffs Madden, Liddy, Polachek, Sohnen and Friedman, unjustly expelled by action of the union membership, may recover from Local 88 whatever damages they may have sustained. The plaintiff Di Pietrantonio however, is not entitled to damages from the local; wronged, not by any act of the membership, but by Atkins personally, he may recover from the latter any pecuniary loss suffered. Finally, as to the liability of the national union,, it is sufficient to observe that the record discloses no wrongdoing on its part to any plaintiff.
*5 “ The judgment of the Appellate Division should be modified insofar as it failed to grant damages to the plaintiffs, in accordance with the views expressed in this opinion, and the matter remitted to Special Term for the assessment of such damages and, as so modified, affirmed, with costs to the plaintiffs.”
Plaintiffs Madden and Liddy were expelled from Local 88 on March 11,1953; plaintiff Polachek was expelled on April 25, 1953; plaintiff Friedman on May 27, 1953; and plaintiff Sohnen on June 1, 1953. Plaintiff Di Pietrantonio had work opportunities denied to him by action of the defendant Atkins on March 2, 1953.
In the proceedings before me, all parties have agreed that damages should be measured to May 6, 1957.
The plaintiffs were and are deck officers in the merchant marine, and the defendant unions have organized and have under contract the bulk of the shipping in the New York area. In order to work as deck officers in the merchant marine, the plaintiffs must be members in good standing in the Local and International Unions and be afforded job opportunities through the local union hiring hall.
The question posed, therefore, is the amount of damages suffered by these plaintiffs by reason of their expulsion from Local 88, except plaintiff Di Pietrantonio, and the denial of work opportunities through the Local 88 hiring hall as to all plaintiffs including Di Pietrantonio. As heretofore stated in the opinion of the Court of Appeals, whatever damages are found should be assessed against Local 88 only .as to all plaintiffs except Di Pietrantonio, and damages assessed against Atkins individually only as to Di Pietrantonio. No damages are to be assessed against the International Union.
The testimony indicates that when licensed deck officers are at work in this industry, they receive wages, food and lodging while aboard ship and vacation benefits. The employer also pays into a jointly operated welfare and pension program an agreed amount for each day of work from which joint fund benefits are purchased for members of the union.
It is my responsibility now to determine the amount of wages, vacation benefits, food and lodging, and welfare and pension payments which the plaintiffs would have earned in the industry had they not been denied job opportunities for the period of approximately four years.
From this finding must be deducted any wages or other benefits received by the plaintiffs during this period of time, as indicated in the record before me.
*6 First as to wages: Wages earned by licensed deck officers in the merchant marine in this industry vary widely. Wages earned may be determined by whether or not the particular employee is licensed to sail as a third mate, second mate, chief mate or captain. It may also vary greatly dependent upon the regularity and length of employment in any particular year. The contracts in the industry further permit an employee to become a “regular” company employee and in this instance his earnings are more regular than otherwise and much greater than persons who are not “regular” company employees. A witness for the defendant, Local 88, Charles Crooks, testified that one master of a ship (captain) earned about $35,000 in one year, and that a chief mate has earned $18,000 a year. The same witness indicated that the average overtime runs 30% of the wages. Other witnesses support the conclusion that necessary overtime would run higher than 30%. It is equally true, of course, that many licensed deck officers make on a yearly basis much less than the figures mentioned above.
As of the date of the denial of work opportunities, plaintiff Sohnen was a third mate, plaintiffs Madden and Polachek were second mates, and plaintiffs Liddy, Friedman and Di Pietrantonio were chief mates. A chief mate can serve in the rank of a chief mate, a second mate or third mate, and the second mate can serve in the rank of second mate and third mate. The third mate can serve only as a third mate. It is also true that the license requirements require a certain minimum amount of sea time before one can “ sit ” to advance his license.
Thus, in measuring damages over a period of approximately four years, it is impossible to know or say with certainty whether or not, for instance, Sohnen, Madden and Polachek might have advanced their license, whether each or all of them might have always sailed in the highest rating available to them or in a combination of the several ratings available to them, whether some or all of them would have become regular company employees under the provisions of the collective bargaining agreement. It is equally uncertain as to whether or not they might have, over all these years, received regular, consistent, day in and day out employment, or whether by reason of the shipping eligibility requirements their priority and repetitive priority at the end of each voyage might have entitled them to less than consistent regular employment.
Counsel for the defendants have argued at length that the nature of employment prior to expulsion should be the norm for measuring their employment herein. Counsel for the plaintiffs have argued that their employment prior to expulsion is *7 affected by the great variances in the industry as above mentioned, and also, in part, affected by the fact that the plaintiffs prior to expulsion purposely stayed ashore to be politically active within their union in order to fight against what they believed to be corruption in their union. Incidentally the president of the International and Local Union, Charles T. Atkins, and the “ shipper” were convicted of back-door shipping. It is also a fact in the record, as indicated in the Court of Appeals decision, that these plaintiffs were originally expelled from their union and denied job opportunities because they became politically active within their union in an effort to improve their union.
Thus, primarily, by reason of the nature of employment in this industry and for the reasons otherwise indicated, I do not believe that prior work experience, prior to expulsion, can be a fair measure of damages in this case.
I cannot conclude, however, as plaintiffs urge, that each of the plaintiffs would have advanced their rating and rank above that which they held at the time of their employment, and I cannot assume that they would be regularly employed always under the highest rating of their license. Nor can I conclude as a certainty that they would have become regular employees of a particular company, and earn wages in the upper brackets of earnings in the industry in the area of $13,000 or $14,000 per year. Thus, I am required, under all of the circumstances, to determine a fair and reasonable measure of damages. I must resort to some practical means that will be just to all parties.
As was stated in the case of Alexander’s Department Stores v. Ohrbach’s (269 App. Div. 321, 328-329): .“The law does not halt or surrender because the state of facts is novel ‘ and the ordinary methods of proving values are not available, but will resort to some practical means that will be just to both parties.’ (Industrial & General Trust, Ltd., v. Tod, 180 N. Y. 215, 231; Central Trust Co. v. West India Improvement Co., 144 App. Div. 560, 566 [1st Dept.].) The Court of Appeals said in the Wakeman case [101 N. Y. 205] that the damages, being prospective, must to some extent ‘ be uncertain and problematical, and yet on that account a person complaining * * * is not to be deprived of all remedy. ’ As was said in Bagley v. Smith (10 N. Y. 489, 499): ‘ Nor are we the more inclined to refuse to make the inquiry, by reason of its difficulty, when we remember that it is the misconduct of the defendants which has rendered it necessary. ’ In MacGregor v. Watts (254 App. Div. 904), the court held: ‘ It is recognized by the courts and *8 by text writers and in digests that a wrongdoer * * * may not escape liability simply because there is * * * none of the ordinary standards for measuring the damages.’ What was said in Myers v. Sea Beach Railway Co. (43 App. Div. 573, 577) is here applicable: * * * The rule that damages which are contingent and uncertain cannot be recovered embraces only such as are not the certain result of the breach, not such as are the certain result but uncertain in amount.’ (See, also, Steitz v. Gifford, 280 N. Y. 15, 20; Eastman Kodak Co. v. Southern Photo Co., 273 U. S. 359, 379; Dart v. Laimbeer, 107 N. Y. 664, 669.) ” (See, also, Duane Jones Co. v. Burke, 306 N. Y. 172; Dunkel v. McDonald, 272 App. Div. 267, affd. 298 N. Y. 586; Allen Props, v. Brydle, 72 N. Y. S. 2d 554, affd. 272 App. Div. 817, motion for leave to appeal dismissed 297 N. Y. 614; Levin v. Frank, 5 Misc 2d 564; Duro Sportswear v. Cogen, 131 N. Y. S. 2d 20,132 N. Y. S. 2d 51, affd. 285 App. Div. 867; Bagley v. Smith, 10 N. Y. 489; Brady v. Erlanger, 188 App. Div. 728.)
Thus, the inquiry turns to a determination of what is fair and reasonable under the circumstances in light of the many variables in this case, occasioned by the nature of employment in the industry.
This court has determined that what an average employee in the industry would earn, in rank equivalent to each plaintiff, would be a fair and reasonable measure of damages in this case.
The plaintiffs offered in evidence their Exhibit 5 “ The Earnings and Employment of Seamen on U. S. Flagship”. This exhibit was an extended Government survey, conducted by the United States Department of Labor, in co-operation with the Federal Maritime Board and the Maritime Administration of the U. S. Department of Commerce. The Government survey is for the year July 1, 1956, to June 30, 1957. The data on page 26 of said survey indicates the yearly variations in available jobs from 1953 to 1957 to be relatively minor. So, too, plaintiffs’ Exhibit 9 shows a fairly constant number of man-days of employment reported to the welfare and pension funds for the years here surveyed. Thus, it is reasonable and necessary in this case to use the average number of days worked during the survey year, as representing the average number of days worked during each of the years plaintiffs were expelled.
Plaintiffs, moreover, in computing the monetary damage have accordingly reduced the wage rates of the surveyed year 1956 to 1957 in accordance with the reduced contract rates of pay for each of the prior years. Thus the average days of *9 employment each year multiplied by the daily wage for each year becomes the measure of average earnings in each year.
In this respect, plaintiffs have submitted damages on two different concepts, based upon the Government survey. Plaintiffs have, on the one hand, prepared a measure of their damage based upon a contention that they each would have sailed in their highest rank during all of the period of their expulsion. On the other hand, plaintiffs have prepared a measurement of their damage based upon the average of all of the rates in which each of the plaintiffs could have served his sea time. Thus, for instance, as to Bobert A. Liddy, the second method proposed by the plaintiffs measured his damage based upon the daily rate of the chief mate, second mate and the third máte, since Mr. Liddy could have served in all of those rates during the period of his expulsion. So too, as to plaintiff Sohnen, damage is measured only in the rate of third mate. While it is true that the second method gives the plaintiff nothing for the denial of their opportunity to advance themselves to a higher grade, and fails to recognize the possibility that they might have become regular employees and sailed regularly in their highest rate, nevertheless I believe and determine that the fair and reasonable method of computing damage under the facts and circumstances in this case, is to take the average wage, as determined by the average of the daily rate, for each of the grades for which each plaintiff could find employment. Thus, as indicated, the daily rate for plaintiff Bobert A. Liddy would be determined by the average of the rate of chief mate, second mate and third mate.
Based upon this average rate for each of the years, computed to reflect the contract rate for each of the years, and premised upon the average number of days of employment available to the average employee, as indicated by the Government survey and Exhibit 9,1 am in a position to determine wages lost through loss of deep-sea employment.
In this industry when employees are not engaged in deep-sea shipping, they may seek night mate’s relief work, relieving deck officers on ships that are in the ports of New York. Testimony indicates that five nights per month would be a minimum to be expected of this kind of employment. Accordingly, therefore, an allowance is to be made for each of the plaintiffs, in addition to the wages for deep-sea earnings, at the rate of five nights per month, for the available time each year above the time consumed at deep-sea employment. Thus credit is given for such employment only for a period of a year when each plaintiff is not employed at deep-sea employment.
*10 Plaintiffs also make claim for the value of the food and lodging which they would have received in addition to their wages when they were employed at sea. They ask this court to put a monetary value on such food and lodging which they lost by reason of the action of the defendants herein.
The collective bargaining agreement signed by the industry employers and the union has valued this cost of food and lodging at $10.50 per day, and grants the men such allowances when they are not lodged and fed on board ship. I find and determine such a measure of damage to be fair and reasonable in this case.
Plaintiffs make a claim for vacation benefits due. The contracts controlling during the period of expulsion provide for such vacation benefits. The Government survey referred to above in terms of annual days of employment specifically excludes days of earned vacation. Accordingly, it is proper to add as a claim of plaintiffs, vacation benefits that would have been earned by them had they received the average number of days of employment in the industry.
Plaintiffs also make a claim for interest and the data submitted indicates that interest is computed, starting as of January 1, 1954, for moneys due in the year 1953, and in the same manner for each year thereafter. I find and determine that interest at 6% may properly be charged against the defendants in behalf of the plaintiffs.
It is further true that for each day of employment of each of the plaintiffs, the contract requires payment by the employers to the Welfare and Pension Fund in the industry, to cover benefits that would have been received by the plaintiff had' they not been expelled. Payments into this fund also, of course, increase the stability of the fund and permit of increased purchases by the fund of benefits as acturial studies indicate. Accordingly, I find and determine that for each day of employment, the amount agreed on by contract between the union and the employer should be paid by the union into the Pension and Welfare Fund.
I also find and determine that each of the plaintiffs did all that was reasonably to be expected of them in an effort to find other employment, and reduce their damages. Such wages earned, the value of subsistence received where evidenced in the record before me, and any other benefits received by plaintiffs, have been computed and subtracted from the equivalent wages and benefits I have found plaintiffs would have received but for the action of the defendants.
*11 I find and determine the resultant damages to be as follows: That as to second mate Bernard A. Madden: He was damaged in the amount of $30,540 for sea-time wages lost, $11,770 for subsistence pay, $1,267 for vacation pay, and $1,835 for night mate wages lost, for a total of $45,412 in lost earnings. From this must be deducted $10,978 for wages actually earned and $1,855 for subsistence actually earned, or a total of $12,833 actually earned, leaving a net loss in earnings of $32,579. To this must be added $7,805 of interest, for a net damage of $40,384. In addition $1,193.50 is due to the Welfare and Pension Fund to cover payments that would have been made if Bernard A. Madden had been employed during the expulsion period.
That as to first mate Robert A. Liddy: He was damaged in the amount of $33,760 for sea-time wages lost, $12,232 for subsistence pay, $1,370 for vacation pay, and $1,870 for night mate wages lost, for a total of $49,232 in lost earnings. From this must be deducted $9,973 for wages actually earned and $476 for subsistence actually earned, or a total of $10,449 actually earned, leaving a net loss in earnings of $38,783. To this must be added $9,043 of interest, for a net damage of $47,826. In addition $1,240.85 is due to the Welfare and Pension Fund to cover payments that would have been made if Robert A. Liddy had been employed during the expulsion period.
That as to second mate Richard J. Polachek: He was damaged in the amount of $29,625 for sea-time wages lost, $11,487 for subsistence pay, $1,140 for vacation pay and $1,817 for night mate wages lost, for a total of $44,069 in lost earnings. From this must be deducted $9,555 for wages actually earned and $3,983 for subsistence actually earned, or a total of $13,538 actually earned, leaving a net loss in earnings of $30,531. To this must be added $6,600 of interest, for a net damage of $37,131. In addition $1,193.50 is due to the Welfare and Pension Fund to cover payments that would have been made if Richard J. Polachek had been employed during the expulsion period.
That as to first mate David Friedman: He was damaged in the amount of $32,172 for sea-time wages lost, $11,644 for subsistence pay, $1,180 for vacation pay, and $1,790 for night mate wages lost, for a total of $46,786 in lost earnings. From this must be deducted $13,977 for wages actually earned and $5,425 for subsistence actually earned, or a total of $19,402 actually earned, leaving a net loss in earnings of $27,304. To this must be added $6,449 of interest, for a net damage of $33,833. In addition, $1,240.85 is due to the Welfare and Pension *12 Fund to cover payments that would have been made if David Friedman had been employed during the expulsion period.
That as to third mate Arthur Sohnen: He was damaged in the amount of $27,940 for sea-time wages lost, $10,649 for subsistence pay, $1,103 for vacation pay, and $1,901 for night mate wages lost, for a total of $41,593 in lost earnings. From this must me deducted $12,777 for wages actually earned and $798 for subsistence actually earned, or a total of $13,575 actually earned, leaving a net loss in earnings of $28,018. To this must be added $6,265 of interest, for a net damage of $34,283. In addition $1,151.25 is due to the Welfare and Pension Fund to cover payments that would have been made if Arthur Sohnen had been employed during the expulsion period.
That as to first mate Pietro Di Pietrantonio: He was damaged in the amount of $33,950 for sea-time wages lost, $12,369 for subsistence pay, $1,370 for vacation pay, and $1,870 for night wages lost, for a total of $49,559 for lost earnings. From this must be deducted $14,118 for wages actually earned and $2,306 for subsistence actually earned, or a total of $16,424 actually earned leaving a net loss in earnings of $33,135. To this must be added $8,442 of' interest, for a net damage of $41,577. In addition $1,240.85 is due to the Welfare and Pension Fund to cover payments that would have been made if Pietro Di Pietrantonio had been employed during his expulsion period.
To recapitulate the above, the total damages due from Local 88 to Madden, Liddy, Polachek, Friedman and Sohnen are $193,457 with an additional $6,020 due to the Welfare and Pension Fund, for a total union liability of $199,477. The total damage due from Atkins individually to Di Pietrantonio is $41,577 with an additional $1,240.85 due to the Welfare and Pension Fund, for a total liability of $42,817.
I further find and direct that costs and disbursements in this matter be taxed in favor of the plaintiffs against the defendants.
This court renders the decision in this matter in accordance with section 440 of the Civil Practice Act. Submit judgment accordingly.